FAIRCHILD v. DEMENT et al.

(Circuit Court, N. D. Illinois, E. D. August 4, 1908.)

No. 27,857.

1. CANCELLATION OF INSTRUMENTS—FRAUD—SUFFICIENCY OF EVIDENCE.

Evidence considered, and held insufficient to authorize a decree for the cancellation of written contracts on the ground of fraud, under the rule that in such case it must be sufficient to sustain a verdict convicting defendant of obtaining property by false pretenses.

2. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—CONTRACT TO ASSIGN INVENTIONS.

A written contract by which the assignor of a patent agreed to convey to the assignee any future inventions made by him relating to the device of the patent or to improvements thereon is not in violation of public policy, and may be specifically enforced, where necessary to secure to the assignee the value of the patent purchased.

In Equity.

Selden Bacon and Arthur W. Underwood, for complainant.

L. W. James and Charles Turner Brown, for defendant Dement.

Walter Ayer, for defendant American Mechanical Cashier Company.

KOHLSAAT, Circuit Judge. This is a bill for specific performance of certain contracts by which, it is alleged, defendant Isaac S. Dement became bound to assign to complainant, Fairchild, certain inventions and improvements in the device of patent No. 618,932, granted February 7, 1899, for mechanical cashier. Defendant denies complainant's right to the relief prayed, and files a cross-bill, alleging want of consideration, fraud, imposition, and misrepresentation in the procurement of said contracts, and prays for their rescission and cancellation, and that the court may decree the reconveyance of certain patents and inventions transferred by him thereunder to Fairchild, and through Fairchild to the American Mechanical Cashier Company, codefendant.

Although the main issues are simple, the case is somewhat complicated, and the record voluminous, owing to the number of contracts and dealings of the parties covering a period of several years. The following facts are uncontroverted:

In 1895 defendant and cross-complainant, Isaac S. Dement, with one Charles F. Bassett, having invented a mechanical cashier, applied for a patent, and while their application was pending, in order to handle their invention commercially, caused to be organized the Mechanical Cashier Company (of Michigan), to which they assigned all their rights to the application and invention, covenanting by the same instrument to sell and transfer to said company any and all further, other, and different improvements and devices of or in regard to mechanical cashiers which they or either of them might from time to time invent or devise. In consideration of this assignment and contract Dement and Bassett each received $48,000 of the stock of the Michigan Company, and Messrs. Tower, Sinclair, and McGarry, who had organized the company, received $32,000 of stock, making a total issue of that

company's stock of $128,000. Nearly four years afterward, in the spring of 1899, negotiations were entered into by Dement and his associates, through a broker by the name of W. C. Johnson, for the sale of the rights of the Michigan Company under its assignment and contracts, and on June 20, 1899, these negotiations culminated in a contract for the purchase of the patent by Fairchild, and a collateral agreement for the employment of Dement to work on the production of a perfected machine under the patent as an employé of complainant. By this contract Fairchild simply stepped into the shoes of the Michigan Company, succeeding to all its rights in the patent; it being provided in the contract that the assignment to be made to Fairchild should—

"cover and include all the right, title, and interest of [the Michigan Company] in and to any other, further, or different improvements, extensions, or reissues relating to mechanical cashiers which it has acquired or may hereafter acquire."

The purchase price agreed to be paid by Fairchild was $135,500 and a royalty of $10 on each machine manufactured. During negotiations which led up to this sale, the broker, Johnson, exhibited to Fairchild what purported to be a contract between himself and the Michigan Company, by which the Michigan Company authorized Johnson to sell the patent for $125,000 net to the company, Johnson to receive as his compensation everything obtained for the patent above the $125,000, and this contract with Johnson was annexed as an exhibit to the contract of sale to Fairchild of June 20, 1899. It now appears that this supposed contract with Johnson was not the true agreement between the parties, but that it was one prepared to show to Fairchild. The real agreement was that Johnson should have everything above $75,000, instead of $125,000. About this time it appears that McGarry and Dement, then president and secretary of the Michigan Company, entered into an agreement with Johnson by which the price paid by Fairchild was to be divided as follows: $75,000 to the Michigan Company; $10,500 to A. L. Barber, in satisfaction of certain claims asserted by him; $10,000 to Johnson; and some small amounts to Foster and Lynn. The rest of the cash was to be divided as follows: One half to Johnson, one fourth to McGarry, and one fourth to Dement; and the royalty reserved in the contract was to be given one third to Johnson, one third to McGarry, and one third to Dement.

The collateral agreement between Fairchild and Dement, made at this time, provided for the employment of Dement by Fairchild at a salary of $100 per week during the construction of the sample machines, and also during the further construction of 1,000 machines by Fairchild, and for the further employment of Dement for 10 years at a salary of $6,000 per year. Dement, besides agreeing to perform the required services, agreed to pay the entire expense of constructing the sample machines above his own salary and $2,500, which he undertook to do within four months, and it was also agreed by him that he—

"would give to said Fairchild or his assigns in the construction of said sample machines, and said 1,000 machines, the benefit of all improvements, inventions,

and discoveries made by said Dement of recording and registering devices for use in connection with said mechanical cashiers" and "that all improvements, inventions, and discoveries made by him during every period of such employment upon or relating to mechanical cashiers or attachments thereto, or upon or relating to machinery for their manufacture or construction, shall be the property of his employer at the time of making such improvement, invention, or discovery, and that he will upon demand of his employer, but at such employer's expense and cost, take out patents thereon, which patents shall be duly assigned to and be the property of such employer."

Dement thereupon entered upon the manufacture of the 10 sample machines. He was not able to put together a satisfactory machine in 4 months as agreed by him; in fact, at the expiration of 21 months there was no such machine. About this time Mr. Bacon, counsel for Mr. Fairchild, had an interview with Dement on Fairchild's behalf, which resulted in a modification of the provision for a 10-year employment of Dement. This contract is in writing, dated April 6, 1901, and was signed by Dement. Fairchild paid in the neighborhood of $30,-000 in the endeavor to get a satisfactory model machine, but without entire success.

During 1900, 1901, and 1902 Dement separately, and also in conjunction with Arthur D. King and with Foster J. Hull, made a number of inventions relating to mechanical cashiers. These were all assigned to Fairchild. Immediately after the purchase of the patent by Fairchild, in June, 1899, he had caused to be organized the National Mechanical Cashier Company (of West Virginia), to which he assigned all his rights. Other companies were organized in the endeavor to dispose of the patent, all of which were afterwards abandoned, and their rights transferred to the codefendant in the present case, the American Mechanical Cashier Company (of New Jersey).

Prior to the organization of the New Jersey Company Fairchild had entered into negotiations with Dement (in April and May, 1901) to secure all his interests in the royalty and in the Michigan Company. The result was an agreement, dated May 25, 1901, that Dement should assign these interests to a representative of Fairchild in consideration of the transfer to him of $40,000 of the stock of the then proposed corporation. Some time during the summer of 1901 Fairchild employed Dement to negotiate with McGarry for the interests of McGarry in the Michigan Company and the royalty, and for the interests of Sinclair and Tower. These negotiations resulted in an agreement with McGarry, and another with Sinclair and Tower, similar to that made by Dement. On the 4th of January, 1902, Dement signed a contract conveying to Fairchild the rights to his invention and improvements for all countries outside of the United States of America.

Dement now claims that his contract of April 6, 1901, by which he released his right to a 10-year term of employment, was without consideration. Fairchild says it cost him $30,000 during this employment of Dement, and even then he did not get the sample machine promised. He worked 21 months, instead of 4 months. These undisputed circumstances, and the contract itself, seem to be a sufficient answer to this contention. Moreover, Dement seems never to have questioned the validity of this contract until this suit was commenced. There

seems to be no shadow of evidence that he was in any way imposed upon. The parties were dealing at arm's length, and he was, so far as the record shows, as well advised and as capable of taking care of his interests as Fairchild.

The principal dispute in the present case, however, is in regard to what the new company was to hold; Dement contending that it was to have, not only the rights as transferred originally by the Michigan Company to Fairchild, but also the royalties which were reserved at that time, and which were afterwards acquired by him, as well as the foreign rights which he acquired by the contract of January 4, 1902—in fact, everything that was transferred to Fairchild or his representatives during the negotiations, extending over a period of several years—while Fairchild insists that it is entitled only to the original rights of the company, subject to a royalty (which he had personally acquired and transferred to his wife).

Fairchild bases his right to the royalties and foreign rights, which he or his assigns hold apart from the company, by virtue of several contracts in writing signed by Dement. These on their face give him a clear title to the rights he is now asserting. These contracts did not, except in a few instances, show the consideration, and Dement testifies that they were signed upon the representations that the royalties and foreign rights were to be transferred by Fairchild or his representatives to the new company. Dement swears that conversations were had in which Fairchild told him that everything was to go to the new company. Fairchild flatly denies that any such conversations were had. The question presented is, therefore, one principally as to the veracity of these two witnesses. In many particulars Fairchild is corroborated by his counsel, Mr. Bacon, also a witness. The contracts on their face are clear, and, if Dement is to be charged with knowledge of everything contained in the papers he has signed, it is difficult to believe that such conversations were actually had.

Dement was a practical business man. There is no evidence of want of mental capacity or undue influence. That he had considerable skill in negotiating is abundantly proven. In his first connection with Fairchild he prepared a pretended contract to be "shown to the purchaser," and another real contract "to be settled by." No satisfactory explanation is made of his division of the original purchase price paid by Fairchild. The transaction looks very much like a diversion of the Michigan Company's assets. With the rightness or wrongness of these dealings the court is not now concerned. But it is difficult to consider this evidence without feeling strongly that Dement was not a man who would be likely to sign contracts recklessly without considering their effect. Moreover, Dement was a court reporter of many years' experience. He must have seen many cases fail for want of evidence. He must have known the weakness of such evidence as now produced on his behalf to establish a contract. He says he signed arms' full of papers for Fairchild—almost got in the habit of signing every time he saw Fairchild's attorney. Why he did not insist that some of these papers should show that Fairchild was to hold for the new corporation is hard to understand.

Cross-complainant's case thus rests almost entirely upon his own testimony, and his story is in every material particular denied by complainant. On this showing he asks a decree of cancellation and rescission of contracts conveying his foreign rights and royalties. He also asks that certain assignments of patents or applications may be set aside and reconveyance decreed. The rule as to what showing should be made to warrant the court in granting such relief is clearly laid down in Atlantic Delaine Co. v. James, 94 U. S. 207, 24 L. Ed. 112, and the same language is repeated in Union Railroad Co. v. Dull, 124 U. S. 174, 8 Sup. Ct. 437, 31 L. Ed. 417:

"Canceling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised, except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representation, unless their falsity is certainly proved. * * *"

And it has been held that, in order to authorize a court of equity to set aside a contract for fraud, such a case must be made out as would authorize a jury to convict the defendant of obtaining property under false pretenses. 18 Enc. Pl. & Pr. p. 75, citing Henshaw v. Bryant, 5 Ill. 97, and Lloyd v. Brewster, 4 Paige (N. Y.) 541, 27 Am. Dec. 88. Under this rule the evidence in the present case is manifestly insufficient to authorize the court to grant a decree of rescission and cancellation.

The bill prays the specific enforcement of the contract to convey future inventions, some of which have been made the subject of patents or applications for patents. That there is no public policy forbidding such contracts is well settled. Westinghouse Air Brake Co. v. Chicago Brake & Mfg. Co. (C. C.) 85 Fed. 787, and cases cited. In a case like the present one damages would be wholly inadequate. If the contract of purchase of the original patent is to be of any value to the purchaser, he must have what he bargained for. The contracts on their face give him the rights he asks. In the opinion of the court they have not been successfully attacked.

Defendant insists that the transactions were unconscionable in character, and that Dement is not only deprived of his inventions, but is now prevented from earning a living at his profession by persons who cannot and will not give him employment themselves. But a court cannot make contracts for the parties. How much of an advantage Fairchild has by his contracts does not clearly appear. If the manufacture of the machine cannot be made successful, his contracts will do him little good. In parting with his various rights, Dement was just as capable, so far as the evidence discloses, of judging their prospective value as Fairchild. It is very likely that Dement contemplated future employment by the new company, and that conversations were had about the matter as Dement testifies; but it is beyond reason to suppose that either of the parties contemplated such employment unless the new company could be made a commercial success; indeed, his contract of April 6, 1901, left this an open question. So that the court cannot seize upon the fact that Dement is not given employment as a ground for withholding the relief prayed. The case

is not one where there is such a shocking inadequacy of consideration that the court may presume fraud.

A decree may be prepared granting the prayer of the bill.