CHADELOID CHEMICAL CO. v. H. B. CHALMERS CO. et al.

(Circuit Court of Appeals, Second Circuit. June 11, 1917.)

No. 269.

1. SPECIFIC PERFORMANCE ☞105(3)—DEFENSES—LACHES.

Two firms, engaged in costly litigation with each other over their respective rights under patents on paint removers, and their members, entered into a compromise agreement, whereby the C. Co. was to be organized and take title to all of the patents and permit each firm to manufacture and sell under all patents. The individual members of the firms agreed to assign to the corporation all improvements or inventions then or thereafter made by them relating to paint removers; to execute an agreement in its favor that they would, without further consideration, disclose and assign to it all inventions already made, or thereafter .made, and to furnish further documents necessary to effectuate the objects indicated. One of the parties having severed his connection with the corporation and the firm of which he was a member in 1911, organized a new company, which manufactured a paint remover under a patent obtained on his application. On having his attention called to the agreement to assign inventions to the C. Co., he replied that the formula was not his own, and by every means sought to keep the C. Co. from learning who devised his new remover, and whether he or the company owned the patents. The facts, however, were brought out in an infringement suit in 1915 or 1916, and soon after the grant of an injunction in that suit the C. Co. sued to compel an assignment of the patent. *Held*, that the suit was not barred by laches, the defendants not having been lulled into security, and not having changed their position in reliance on plaintiff's inaction.

2. CONTRACTS ☞68—PATENTS ☞183—AGREEMENTS TO ASSIGN INVENTIONS——REQUISITES AND VALIDITY.

The agreement for the assignment of all improvements or inventions thereafter made did not lack formality or consideration.

3. PATENTS ☞183—AGREEMENTS TO ASSIGN FUTURE INVENTIONS—VALIDITY.

The agreement to assign future improvements or inventions was not invalid, as constituting a mortgage upon the future operation of man's brain, though not limited as to time, as the intent was to safeguard a particular business.

4. PATENTS ☞183—AGREEMENTS TO ASSIGN FUTURE INVENTIONS—ANNULMENT.

The agreement was not annulled by the action of the corporation in paying a salary or retainer to one of the parties for supervising chemical experiments looking to new or improved remover devices, as none of the parties was bound to invent or attempt to invent anything, and, even if the corporation did discharge such party from the contract, another of the parties could not complain, but remained bound.

5. SPECIFIC PERFORMANCE ☞108—RELIEF AWARDED—INJUNCTION.

In a suit to compel the assignment of the patents to the C. Co., an injunction restraining defendants from any future use of the patents or inventions was in proper form, as the individual defendant and the company which took with notice were contractually excluded from any use of the patents or inventions.

6. COURTS ☞407(5)—CIRCUIT COURT OF APPEALS—SCOPE OF REVIEW.

Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1134 [Comp. St. 1916, § 1121]) § 129, provides that, where an injunction shall be granted, continued, refused, or dissolved by an interlocutory order or decree, an appeal may be taken from such interlocutory order or decree to the Circuit Court of Appeals, notwithstanding an appeal upon final decree might be

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

taken directly to the Supreme Court. *Held,* that on an appeal from an interlocutory decree, in a suit to compel an assignment of patents, granting an injunction and directing an accounting, the propriety of the injunction was the only matter reviewable, and the court could not determine whether it was proper to grant an accounting as against a trustee ex maleficio.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Chadeloid Chemical Company against the H. B. Chalmers Company and another. From an interlocutory decree granting an injunction and directing an accounting, defendants appeal. Affirmed.

See, also, 242 Fed. 71, —— C. C. A. ——.

The bill, filed in May, 1916, demands that defendants convey or have conveyed and transferred to plaintiff two patents (1,066,251 and 1,079,635), issued to one Dunham in 1913, on applications of the individual defendant Chalmers, and also all other "formulæ improvements and inventions made or devised by Chalmers relating to paint and varnish removers." Injunction against dealing with or in or disposing of said patents, formulæ, etc., was also prayed for, as was further relief. The decree enjoined defendants from any further use of Chalmers' patents or inventions, directed their conveyance to plaintiff, and ordered that an account be taken of profits resulting to defendants from the manufacture, etc., of removers under said patents, and of damages suffered by plaintiff by reason of the wrongful retention of the same by defendants. This appeal is under section 129, Judicial Code.

A paint remover is a chemical compound for softening and cleansing from wood, etc., hardened paint or varnish, without the application of heat. This suit is the latest chapter of litigation over the business in removers established upon the Ellis patent (714,880) as a foundation. Plaintiff company owns that patent, which has been much contested and very broadly sustained.[1]

Ellis' patent issued in 1902, plaintiff was organized in 1905, and immediately acquired it, under circumstances and for reasons shadowed forth by the fantastic name "Chadeloid," which is a composite of Chalmers, Ellis, and Elting, with some flavor of Adelite and Phenoid.

The patentee Ellis and defendant Chalmers, as partners, and afterwards shareholders in the Ellis-Chalmers Company (hereinafter called Ellis Company), owned the patent until 1905, sought a market for the remover which they called Phenoid, and fought infringers. This produced an action against the Adams & Elting Company (hereinafter called Adams Company), which made and sold Adelite. Such suit was pending and very expensive in the winter of 1904–5.

On January 17, 1905, an agreement in writing was made between Ellis Company, Adams Company, and Elting, Adams, Chalmers, and Ellis, reciting the ownership of the Ellis patent by Ellis Company, of sundry patents and applications therefor by Adams Company, and the pendency of the aforesaid suit, and agreeing that said suit be abandoned, the validity of Ellis patent recognized, the Chadeloid Company (this plaintiff) organized with the four individual contracting parties and (semble) their counsel as directors, that Chadeloid stock be distributed in a manner agreed upon (making Chalmers a large share-

---

[1] Chadeloid Co. v. De Ronde Co. (C. C.) 146 Fed. 988; Chadeloid Co. v. Chicago, etc., Co. (C. C.) 173 Fed. 797; Id. (C. C.) 180 Fed. 770; Chadeloid Co. v. Daxe (C. C.) 180 Fed. 1004; Chadeloid Co. v. Thurston (D. C.) 220 Fed. 685; Chadeloid Co. v. Wilson (D. C.) 220 Fed. 681; Id., 224 Fed. 481, 140 C. C. A. 189. In the Southern District of New York, the corporate defendant was enjoined as an infringer—on motion for preliminary injunction in the usual patent suit, in April, 1916.

holder), that the Ellis and all other existing or thereafter acquired paint remover patents belonging to the parties should forthwith be assigned to the newly formed company, and that both Adams Company and Ellis Company should have free license to make, use, and sell under the Ellis and all other patents then or thereafter acquired by Chadeloid Company and relating to removers. Finally all the natural persons contracting, covenanted to assign to the intended corporation "all improvements or inventions which any of the parties hereto may have made, or may hereafter make, relating to paint and varnish removers" and to "execute an agreement in favor of said Chadeloid Chemical Company that [they] will without further consideration disclose and assign to said company all inventions which [they] may now have made or may hereafter make relating to removers"; and also specifically give "the right to apply for letters patent thereon." There was also a covenant to furnish further documents, as might appear necessary to effectuate the objects indicated.

Accordingly and on February 27, 1905, Chadeloid Company having been created, Adams, Elting, Ellis, and Chalmers in one writing, "severally" covenanted and agreed as they had in the previous month contracted to agree. A nominal or $1 consideration is specified as moving from Chadeloid Company to each of Chalmers et al., and the contract is under seal.

The effect of this business arrangement was to make a holding company for the Ellis and all other existing and future paint remover inventions, made by any party to the agreements referred to. The holding company (this plaintiff) was a convenience or method of keeping the peace between Adams and Elting and their corporation on the one hand and Chalmers and Ellis and their corporation on the other. Each licensed concern could manufacture under all the owned patents, and they pooled their interests as to infringers, against whom the campaign indicated by the list of decisions just given was then opened, with sufficient success to make an income for the holding company out of royalties resulting from such vigorous legal warfare, of which (by agreement) the Adams-Elting side of the bargain paid four-fifths of the cost for two years, or until (as the event proved) Chadeloid Company became self-supporting.

Chalmers continued to be actively concerned in Ellis-Chalmers Company until 1911, when he sold his interest, having previously disposed of his Chadeloid stock. Soon thereafter he organized the defendant Chalmers Company a concern always controlled by himself. He had apparently become dissatisfied with the action of Chadeloid Company in paying a salary or retainer to Ellis that chemical experiments looking to new or improved remover devices might be conducted under the latter's supervision. But he also probably intended to start a rival business, for on October 11, 1911, he applied for the patent subsequently issued as 1,079,635. Then or shortly thereafter he sent to plaintiff a sample of his "Chalco" remover, was told that it infringed Ellis, and had his attention called to his agreement of 1905. He replied that he doubted the validity of the agreement, but that the "Chalco" formula was not his own, but that of "one of the greatest chemists of the country," although he had the right to use it.

Formal notice was promptly given H. B. Chalmers Company that the articles sold by it were infringements, and when in 1913 the earliest Chalmers patent issued, demand for its assignment was at once made by plaintiff upon Dunham. It appears by the answer herein that Dunham was the secretary of Chalmers Company, that the applications had been assigned to him as secretary, and that the inventions were always the company's property, although the patents were not formally assigned to defendant corporation until May, 1914. When demand was made on Dunham, he disclosed none of these facts to plaintiff, and from his attitude it was a fair inference that he personally was or might claim to be a purchaser for value.

The exact nature and ingredients of a chemical compound are not easily discoverable by analysis, and even after both Chalmers' patents had issued defendants did not apprise plaintiff that what was being sold by Chalmers Company was a remover of Chalmers' invention, made under his patents and according to the disclosures thereof, which patents were the property of the corporate defendant.

It does not appear just when these particulars were discovered by plaintiff. In 1915-16 Chalmers Company was sued as an infringer of the Ellis patent, and the facts referred to should there have appeared. This action was instituted very soon after injunction granted ut supra in the infringement suit.

Wm. Houston Kenyon and Gorham Crosby, both of New York City, for appellants.

Frederick S. Duncan, of New York City, for appellee.

Before COXE, WARD, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as as above). Of the very numerous objections to recovery made by defendants, we notice the following: (1) Plaintiff's demand is barred by laches; (2) it is based on a contract unlawful because unconscionable in its scope, and avoided by its failure to limit a time after which Chalmers et al. would be free to keep their own inventions; (3) Chalmers was discharged by plaintiff's new or further agreement with Ellis; (4) plaintiff is not entitled to such an injunction as was granted, nor (5) to any accounting.

[1] (1) The facts as we have found them do not rest on undisputed evidence. On several points Chalmers himself has testified at variance with our findings. We are, however, satisfied (as was the court below) that the material occurrences were as given above, and that by every means in his power Chalmers, well remembering and fearing his agreements of 1905, sought to keep plaintiff in puzzled uncertainty as to who had devised his new removers, and whether he or his company owned the patents covering them—if they really were the removers of the patents.

This view of the facts completely exonerates plaintiff from the charge of laches. Defendants, after fullest notice, proceeded to create and expand a business which they knew to be obnoxious both to an ordinary patent suit and such action as the present; never have they been lulled into security or changed their position in reliance on plaintiff's inaction. A party who compels one inquiring for facts to play hide and seek for them is not in a position to claim laches, at least after the passage of so short a time as is here relied on. Whether any, or what, length of years would suffice, is not now presented for decision.

[2, 3] (2) The agreements of 1905 did not lack formality or consideration. Nor did they constitute that mortgage upon the future operation of a man's brain which has often been viewed with disfavor. Aspinwall v. Gill (C. C.) 32 Fed. 697. Their plain intent was to safeguard the future of one particular business, that of paint removers. This is not unconscionable, nor in unreasonable restraint of trade. Westinghouse, etc., Co. v. Chicago, etc., Co. (C. C.) 85 Fed. 786; Dick v. Fuller (D. C.) 198 Fed. 404, and cases cited. Nor does failure to limit the time during which the agreeing parties were to surrender inventions vitiate the contract. Thibodeau v. Hildreth, 124 Fed. 892, 60 C. C. A. 78, 63 L. R. A. 480. The case cited is of an agreement

243 F.—39

between employed and employer, and the contract was upheld as a reasonable protection of the master's business. The contract in this case was for the protection of what was in effect the business of the four men who bound themselves, and the same result is reached by the same reasoning.

[4] (3) There was no new agreement with Ellis in the sense of an annulment of that of 1905. None of the contracting parties was bound to invent or attempt so to do; they only agreed that, if they did make inventions of a certain kind, they would disclose and assign the same. Ellis was employed to work as an experimenting chemist, which is quite a different matter. But even if Chadeloid Company had discharged Ellis from his contract, Chalmers had no right to complain. He had severally contracted, and remained bound, even though Ellis had been released. If the conduct of Chadeloid Company in giving such release was injurious to Chalmers as a shareholder, his remedy plainly did not consist in breaking his own agreement.

[5] (4) Defendants seem to think that the injunction issued is such as is usually granted in an action on a patent. This is only true in the sense that, having been compelled to surrender patents that do not belong to them, they are forbidden to manufacture what the patents disclose. This last is what does happen to some rare infringers who have an erroneously issued patent covering absolutely nothing not already patented. But Chalmers and his company (which took with ample notice, and is but another name for Chalmers himself) should have *disclosed* and *assigned* these very inventions; therefore they are contractually excluded from any use of them, and the injunction was in proper form.

[6] (5) The court below granted an accounting as against a trustee ex maleficio. Whether this was within the rules of equity is not now before us. The decree appealed from is interlocutory. We can review it only by force of the statute now contained in section 129, Jud. Code. An appeal under this section brings up nothing but the propriety of granting or refusing an injunction or receivership, as the case may be. Procedure not specifically covered by the statute remains unchanged thereby. The question of accounting must await final decree and is unaffected by this appeal. Kilmer v. Griswold, 67 Fed. 1017, 15 C. C. A. 161; Howe v. Dayton, 210 Fed. 801, 127 C. C. A. 351, and cases cited; Lederer v. Garage, etc., Co., 235 Fed. 527, 149 C. C. A. 73.

Decree affirmed, with costs.