## CONWAY et al. v. WHITE.

(Circuit Court of Appeals, Second Circuit. June 29, 1925.)

No. 233.

1. **Specific performance ⧉71—Contract to sell or transfer patented right may be specifically enforced.**

A contract to sell or transfer patented right may be specifically enforced.

2. **Specific performance ⧉71—Agreements to assign future inventions may be specifically enforced.**

Agreements to assign any future inventions one may make may be specifically enforced, not being invalid as contrary to public policy.

3. **Master and servant ⧉62—Contract that inventions of employee should become property of employer held not to lack consideration, and not unreasonable.**

Contract of employment, providing that inventions made by employee during term, and usable by employer, should be property of employer, *held* not to lack consideration, and not unreasonable, invalid, or unconscionable.

4. **Patents ⧉26(1)—Elements of existing invention may be used with other elements and correlated to coact jointly and make up specific combination of patent.**

Elements of existing invention may be used with other elements and correlated so that they coact jointly and make up specific combination of patent.

5. **Patents ⧉30(1)—Invention held to have been made at time its essential parts were completed.**

Invention by one contracting to assign patents and applications to employer *held* made in November, 1920, during employment, where it had been completed in its essential parts at that time, though it may have been perfected at a somewhat later date.

6. **Contracts ⧉211—Time in equity is not ordinarily regarded as essence of contract.**

Time in equity is not ordinarily regarded as of the essence of a contract, differing from law in this respect.

7. **Contracts ⧉316(6), 322(1)—Party cannot set up nonperformance as defense after waiving performance; burden of proving waiver is on plaintiff.**

Defendant who has waived performance by plaintiff of some act which the latter was to perform under contract is thereby precluded from setting up nonperformance as a defense, but burden of proving the waiver rests on plaintiff.

8. **Master and servant ⧉62—Employee, paid in full, cannot plead insolvency of company as defense to executing transfer of inventions.**

Under contract of employment, providing that inventions made during the term should be property of employer, employee, requested to transfer inventions, was not relieved of obligation because company was insolvent, as long as he had been paid in full.

9. **Specific performance ⧉12—Insolvency may be good defense to suit for specific performance.**

Insolvency may be a good defense to a suit for specific performance, but only where plaintiff is not in a situation to perform his covenants with the defendant.

10. **Specific performance ⧉101—One who has received benefits of substantial preformance of contract cannot retain benefits and defeat suit for specific performance.**

A person who has received benefits of a substantial performance of contract cannot at the same time retain the benefits of such performance and defeat a suit for the specific performance of his part of the agreement.

**11. Contracts ⚖➞271—Party intending to rescind contract because of failure to perform must give notice.**

If a party means to rescind a contract because of failure to perform it, he must give clear notice of his intention to do so, unless the contract itself dispenses with such notice, or unless notice becomes unnecessary by reason of conduct of parties.

**12. Master and servant ⚖➞62—Employee, receiving benefits under contract, may not repudiate obligations because of insolvency of employer.**

Employee, who served under contract providing that inventions made during term of employment should be property of employer until after demand for transfer of applications for patent, could not thereafter repudiate his obligation to execute transfer because of insolvency of employer.

**13. Master and servant ⚖➞62—Invention of employee under contract providing it should be property of employer held under executed trust by employee.**

Where contract of employment provided that all inventions made by employee during term should be property of employer, and should be held for its benefit, the moment an invention was made inventor became a trustee under an executed trust.

**14. Master and servant ⚖➞62—Employer's successor entitled to specific performance of employee's agreement to transfer invention.**

Under a contract of employment providing that inventions made by employee should be property of employer, assignee of one purchasing employer's assets, *held* equitable owner of inventions of employee, and entitled to specific performance of agreement to assign invention.

Appeal from the District Court of the United States for the District of Connecticut.

Suit by Earle E. Conway and others, trustees, against Frank C. White. From a decree dismissing the bill, plaintiffs appeal. Reversed, with directions.

For District Court's opinion, see 300 F. 866.

The plaintiff Earle E. Conway is a citizen of the state of Massachusetts, and the plaintiffs Carle C. Conway and Theodore P. Brown are citizens of the state of New York. They are trustees under a declaration of trust, dated April 30, 1913. The defendant is a citizen of the state of Connecticut.

The suit is brought to enforce the specific performance of a contract between defendant and the predecessor in interest of the plaintiffs. The Wilcox & White Company, a Connecticut corporation, hereinafter called the company, entered into a contract with defendant, which contract was dated March 25, 1920, by which it was agreed that the company employed defendant as its mechanical engineer, the employment to commence on April 1, 1920, and to terminate on March 31, 1925.

The company was engaged in the manufacture of player pianos, reproducing pianos, and mechanical devices in connection therewith and with musical instruments generally, and in the manufacture of music rolls and other appurtenances used with such pianos and musical instruments. The said manufacture was carried on by means of certain patents, secret methods, processes, and appliances which belonged to the company, and which it was agreed were to be kept secret. It was provided by the contract with defendant that "all knowledge and information which" the defendant "now possesses or shall hereafter acquire respecting said secrets and all inventions and discoveries" made by him during the term of his employment shall at all times and for all purposes be regarded as acquired and held by him "in a fiduciary capacity and solely for the benefit of the" company.

The contract also provided as follows: "Fourth: The party of the second part (defendant) agrees that he will, when required, make and execute any and all instruments in writing that may be deemed by the party of the first part, proper and necessary to transact and vest in the party of the first part the entire right, title, and interest in all inventions and discoveries made by the party of the second part, during the term of his employment, which in any way may affect any articles manufactured by the party of the second part and used or capable of being used in the business of the party of the first part."

The bill asked that in pursuance of the above agreement, "the defendant be directed to assign to the plaintiffs the entire right, title, and interest in and to said applications for United States letters patent, serial Nos. 455,346 and 440,296."

The company was adjudged a bankrupt in July, 1921, and a trustee in bankruptcy was appointed, and the bankrupt's estate was sold at auction to the highest bidder, and he paid the purchase price for the same. Thereafter the purchaser aforesaid assigned all his right, title, and interest in the contract which the bankrupts had with defendant, and in and to all inventions, applications, patents, and patent rights to the plaintiffs herein, and the trustee in bankruptcy thereupon assigned and transferred the same to the plaintiffs.

The case was heard at length, and, after testimony was in the court, decided that plaintiffs had not proved their case, and a

decree was entered dismissing the bill with costs.

Louis W. Southgate, of New York City (Robert C. Cooley, of Springfield, Mass., O. Ellery Edwards, of New York City, of counsel), for appellants.

Mitchell Bros., of New York City (Robert C. Mitchell and George H. Mitchell, both of New York City, of counsel), for appellee.

Before ROGERS, MANTON and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This is the second time this case has been before this court. When the case first came before the District Court a motion was made to dismiss the bill on the ground that it did not state facts sufficient to constitute a cause of action. The District Judge granted the motion and dismissed the bill. On appeal to this court we held that the bill stated facts sufficient, if true, to entitle the plaintiffs to the relief sought. We accordingly reversed the decree and remanded the case, with directions to reinstate the bill, and proceed to the trial of the issues. 292 F. 837. The bill was accordingly reinstated, and the court proceeded to a trial of the issues as directed. At the conclusion of the trial, and after the matter had been duly considered, the District Judge entered a decree again dismissing the bill, with costs.

The bill was filed to compel defendant in accordance with his agreement to assign to plaintiffs his entire right, title, and interest in United States letters patent, serial Nos. 455,346 and 440,296. The principal property right involved is the legal title to an invention involving specific detail combinations in a grand player piano.

The plaintiffs rely upon a provision found in the contract of employment which the company made with the defendant on March 25, 1920, and by which the company employed the defendant as its mechanical engineer. The term of his employment began on April 1, 1920, and it was to terminate on March 31, 1925. It contained the provision which is to be found in the statement preliminary to this opinion which obligated the defendant, "when required," to transfer to the company his entire right, title, and interest in any inventions made by him during the period of his employment, and which were capable of being used in the company's business.

The plaintiffs herein state in their bill that they seek to obtain title to certain patents, patent rights, and pending applications now in the possession of the defendant. They base their claim on the rights they have derived in the following manner: That the company was entitled to the rights in the patents and in the applications for patents which are herein involved; that the company was adjudged a bankrupt, and its estate passed to its trustee in bankruptcy; that its estate was sold at auction to one Norman November, who was the highest bidder, and who paid the purchase price for the same; that subsequently the said November assigned all his right, title, and interest in the patents and applications for patents, which he had acquired by his purchase, to the plaintiffs.

The plaintiffs in their complaint alleged that during the time of the defendant's employment under his contract he made certain inventions, the substances of which were embodied in applications for United States letters patent as follows: "Serial No. 455,-346, filed March 24, 1921, for drawer construction; and serial No. 440,296, filed January 27, 1921, for transposing mechanism." It was averred that these applications were filed at the cost and expense of the company.

It was alleged that defendant still retains title to the unassigned applications, and refuses to assign the same to the plaintiffs, although he has been requested to do so, and that, unless the title is assigned to the plaintiffs, they will be irreparably damaged, and they asked that specific performance of his agreement be ordered.

The defendant in his answer, referring to the invention, the substance of which was embodied in application for letters patent of the United States, serial No. 455,346, alleged that essential and material parts thereof were invented, discovered, and completed by him prior to the commencement of the term of his employment under the contract, and in his answer referring to the application for letters patent, serial No. 440,296, he admitted that during the time of his employment under the contract he made an invention, the substance of which is embodied in that application, but he stated that he was without information as to whether those applications were filed at the cost and expense of the company.

For a separate defense he alleged that the company had never performed its part of the contract, nor had the receivers or the trustee in bankruptcy; neither had the plaintiffs performed or offered to perform the same. The answer alleged as follows: " * * * On the contrary defendant's salary and com-

pensation under said contract have not been paid, except that the face or principal amount of his salary and compensation through the month of March, 1921, has been paid, and $650 of his salary or compensation for the month of April, 1921, has been paid. Beginning shortly after the commencement of defendant's employment under said contract, all payments which were made to defendant thereunder for salary or compensation were wrongfully delayed, and were made in partial payments, and no interest has ever been paid or tendered to the defendant for any of the delayed payments."

[1] It is of course well-settled law that a contract to sell or transfer a patented right, like a contract to sell real estate, may be specifically enforced. The reason is that there is no accurate measure of damages, and a pecuniary payment is inadequate relief. Hapgood v. Rosenstock (C. C.) 23 F. 86; New York Paper Bag Machine Co. v. Union Paper Bag Machine Co. (C. C.) 32 F. 783; Hull v. Pitrat (C. C.) 45 F. 94.

In Littlefield v. Perry, 21 Wall. 205, 226 (22 L. Ed. 577), Chief Justice Waite, writing for the court, recognized this doctrine when he said: "An assignment of an imperfect invention, with all improvements upon it that the inventor may make, is equivalent in equity to an assignment of the perfected results."

[2] And agreements to assign any future inventions one may make may also be specifically enforced. Such contracts are not contrary to public policy, and are not on that account necessarily invalid. Aspinwall Manuf. Co. v. Gill (C. C.) 32 F. 697, 700; Westinghouse Air Brake Co. v. Chicago Brake & Mfg. Co. (C. C.) 85 F. 787; Mississippi Glass Co. v. Franzen, 143 F. 510, 74 C. C. A. 135, 6 Ann. Cas. 707; Fairchild v. Dement (C. C.) 164 F. 200; A. B. Dick Co. v. Fuller (D. C.) 198 F. 404; Lion Tractor Co. v. Bull Tractor Co., 231 F. 156, 161, 145 C. C. A. 344; Wege v. Safe-Cabinet, 249 F. 696, 704, 161 C. C. A. 606.

This court, in T. B. Harms & Francis, Day & Hunter v. Stern, 229 F. 42, 48, 145 C. C. A. 2, in a copyright case, said that, "if a vendor sells future acquisitions—in this case musical compositions at the time unwritten—the equitable title to the property attaches the moment it comes into existence and vests in the grantee. Holroyd v. Marshall, 10 House of Lords Cases, 191 (1862)." We added that "it would seem that an agreement made by an author assigning his interest in any future musical composition he might compose, if supported by a valuable consideration and limited in time, is as much entitled to be specifically enforced as agreements made by a patentee who assigns all future improvements on a patented device."

In Chadeloid Chemical Co. v. H. B. Chalmers Co., 243 F. 606, 156 C. C. A. 304, this court affirmed a decree which granted specific performance of an agreement to assign all improvements or inventions which the parties "may have made or may hereafter make relating to paint and varnish removers." It was pointed out in the opinion that the plain intent of the agreement was to safeguard the business in which the parties were engaged, and that it was not an unconscionable or an unreasonable restraint of trade, and it was said that the failure to limit the time during which the agreeing parties were to surrender inventions did not vitiate the contract. That proposition is not controverted in this case, and it would be hopeless if one undertook now to question it. But, as we pointed out, when this case was here before, the theory on which this bill proceeds is that the defendant is a trustee and holds the legal title to property the beneficial ownership of which is not in him.

[3] The contract in this case did not lack consideration, and its plain intent was the protection of the business in which the company was engaged. It was not an agreement to assign in gross the defendant's future labors as an inventor, but only the inventions and discoveries made during the term of his employment, and which in any way might affect the articles manufactured by the company, and which were used or capable of being used in the business. There was nothing in the agreement which was unreasonable, or which rendered it invalid or unconscionable. We do not understand that the validity of the agreement is challenged, or that the defendant is at liberty now to challenge it. The validity of his agreement was really settled as between these parties by our former decision, and it is no longer open to controversy in this court.

We come now to the consideration of the question whether the invention claimed in application serial No. 455,346 was made by defendant during the term of his employment under the contract he entered into with the company. That employment began on April 1, 1920, and he continued in its service for more than a year from that time. On July 14, 1921, the company was adjudged to be bankrupt, and receivers were at that time appointed to take possession of its property

and empowered to carry on its business for a period of 30 days. On November 17, 1921, defendant wrote the receivers that, as the company had breached its contract with him, he elected to rescind and terminate the contract. As application serial No. 455,346 was filed on March 24, 1921, it clearly was filed within the period of defendant's actual employment by the company, and the question is whether the invention was actually made within the same period. The plaintiffs claim that it was. The defendant claims that it was not, and the court below has found that it was not.

It was the theory of the company that the invention was made while defendant was in its employment, and the company, on March 25, 1921, requested him to transfer his right, title, and interest in the invention pursuant to his agreement. The letter which the company addressed to him, after calling his attention to the fourth paragraph of his contract, in which he had agreed to transfer his entire right, title, and interest in all inventions made by him during the term of his employment, and when requested to do so, asked, "Will you therefore kindly take the necessary steps to transfer to the Wilcox & White Company all inventions made by you since March 25, 1920?" This request was ignored, and the transfer papers which had been prepared by the company's attorneys for his signature were never executed.

When was the invention made which is covered by application No. 455,346? The testimony shows that a player piano like that illustrated in the drawings in that application was built in the company's factory in the fall of 1920, and was tested in the middle of November, 1920. An engineer in the employ of the company at the time the machine was built and tested testified to the facts. At the time he gave his testimony he was in the employ of the Chickering Piano Company. He stated that it was tested out and found to be in perfect condition, and was shipped to New York to the A. B. Chase Warerooms. His statement was that at that time he made the necessary tests and found the instrument worked perfectly. The defendant, however, testified that he, the defendant, protested against its shipment, and stated that it did not work to his satisfaction. He was asked what was done afterwards to make the invention perfect. His reply was: "The very important thing that was done on the very next instrument that was made was to put in heavier roller wires. That instrument there, that is, the A. B. Chase piano, was fitted with

coupler wires that measured .175 inches in diameter. The very next instrument made was fitted with coupler wires .187 inches in diameter."

He was asked to state his best recollection as to when the next instrument was made, and answered that he did not remember. He was then asked whether it was before March 15, 1921, and replied that he could not tell. What he himself thought of it at that time appears from a letter under date of March 15, 1921, to the representatives of the company in London. He sent with the letters photographs of the piano. He wrote it "is the best thing that can be devised." He also stated in the letter: "We believe that we have the finest thing now that has ever been invented in the way of player pianos." And he added: "A lot of manufacturers in this country have seen this instrument, and they are all very much pleased with it, and it looks to the writer as though this was the coming thing in the way of reproducing pianos." The letter was signed "The Wilcox & White Company, by F. C. White." It is to be remarked that at the date of this letter the contract was in full force, and the writer was serving under it. It is also to be remarked that the "we" mentioned as "having the finest thing" ever invented in the way of a player piano is the company for which he was working under the contract. It is certainly some indication that he then understood that the invention was made on its behalf and was its property.

But it appears that in an interference proceeding in the Patent Office this defendant filed a sworn statement in that office on June 9, 1923, in which he declared: "I conceived the invention as specifically claimed in the several counts in interference on or about June 9, 1920, on which date I also made drawings of said invention and disclosed it to others. At the same time I also made a brief written description thereof. I thereupon started the work of constructing a full-sized embodiment of my invention, and the first experimental structure was finished and tested in December, 1920, but said structure was not successful. I thereupon continued my efforts, and the first successful instrument embodying my said invention was completed and tested on or about April 8, 1921."

[4] It may be true, as we have seen defendant asserted it to be true in his answer, that a certain separate element or even elements of the patent applied for in serial No. 455,-346 had been invented by him prior to 1920, but that did not preclude him from using

them with other elements and correlating them with other and new elements so that they would coact jointly and make up the specific combination which defendant sought to patent by his application No. 455,346.

[5] As application serial No. 455,346 was filed March 25, 1921, and the testimony discloses that in its essential parts the invention had been made in November, 1920, even though it may have been at a somewhat later time perfected, and we must hold that the invention dates from November, 1920, when a specimen machine was made and found so perfect that it was shipped from the factory in Meriden, Conn., to the A. B. Chase Warerooms in New York City.

The rule is laid down in Walker on Patents (5th Ed.) § 70, p. 87, as follows: "In cases where the inventor makes a specimen of the thing invented, before he makes any model, or drawing, or written description to represent that thing, the invention will date from the completion of that specimen. Perfection is not necessary to such a specimen in order to entitle it to such an effect. Substantial completeness is enough."

The law of combination invention is well established. In Loom Co. v. Higgins, 105 U. S. 580, 591 (26 L. Ed. 1177), Mr. Justice Bradley laid it down as a general rule "that, if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention." And in Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 S. Ct. 652, 656 (53 L. Ed. 1034), Mr. Justice Day said: "It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent." It is not important or essential that all the elements claimed should be new where the claims are for a combination, if the combination be new or there be a new mode of organization or a better result. Dunn Manufacturing Co. v. Standard Computing Scale Co., 163 F. 521, 523, 90 C. C. A. 331; Fairbanks, Morse & Co. v. Stickney, 123 F. 79, 82, 59 C. C. A. 209.

This brings us to a consideration of the demand which was made on defendant that he should transfer his interest in the patents in accordance with the terms of his contract of employment. The terms of the agreement relating to that matter appear in paragraph 4 of the contract hereinbefore set forth. In it he agreed to execute the necessary papers, "when required." The managing director of the company sent such a demand to him on March 25, 1921. At the time the demand was made defendant was still in the service of the company. And on March 28, 1921, the attorneys for the company wrote him on the subject, sending the assignment papers to him to execute. It is true that at that time the company was behind to some extent in its payment of his salary. But in the letter in which he was requested to execute the necessary papers to transfer to the company all inventions made by him since March 25, 1920 (when the contract was signed), a check was sent him covering the amount due and unpaid on his salary account. He cashed the check without making any objection, and continued in the service of the company.

The defendant in his answer sets up, as a defense to this suit, the failure on the part of the company to perform its contract. The answer states, as heretofore set forth, the wrongful delays in paying his salary. And the answer specifically admits that the payment of defendant's salary in full was made in March, 1921, and that $650 was paid on his salary for April, 1921. But the point is made that, while defendant was paid his salary promptly during the first months of his employment, thereafter, the payments were not made on the exact days when the salary became due. The fact is, however, that he acquiesced in the delay, received the payments as made, and continued in the employment as before.

When the case was here before, this court said that, if the company "was not in default under the contract when the defendant made the inventions in suit, was not in default when the defendant made his applications for the patents, and was not in default when the company required him to execute the papers necessary to transfer and vest in it the entire right, title, and interest in the inventions in suit, it was then the owner of those inventions in equity being possessed of vested rights therein."

The District Judge has now found that the company was in default at the time plaintiffs' claim defendant made the inventions herein involved and filed his applications therefor. In his opinion he says: "From a careful consideration of the voluminous testimony, and especially that of Charles H. Warfield, treasurer of the company, I am satisfied that from September to October, 1920, down to the date of bankruptcy in July, 1921, the company was practically insolvent and unable to meet its obligations. During that entire period it appears that defendant was not paid his salary installments, either

on time or in full as the contract required, so that when discharged by the receivers a large amount was still due him."

One of the questions therefore presented is whether the company had so breached its contract with defendant that plaintiffs are in no position to enforce the specific performance of the defendant's agreement to transfer, "when required," his "entire right, title, and interest" in any inventions and discoveries made by him during the term of his employment.

Under the agreement between the company and defendant the former agreed to pay the latter his salary in equal monthly installments at the end of each month during the term of the contract. His salary for the first year was fixed in the contract at $8,000, so that he was to be paid $666.66 at the end of each month in that year. This installment was paid according to the agreement for the months of May, June, July, and August, but, beginning with the month of September, the company failed to make the salary payments promptly as they became due, and we concede that, after September 30, 1920, the company did not make payment to defendant promptly on the dates when the salary became due. Nevertheless, sums of money were paid to him from time to time on account, and he was paid in full for the nine installments due during the calendar year 1920.

In the latter part of the year 1920 the musical instrument business throughout the country was much depressed. The "buyers' strike" took place, and, as one of the witnesses in this case expressed it "the musical instrument business fell flat." In addition, the company was having some troubles of its own over its patents, which interfered more or less with the sale of its instruments. It became necessary for the company to put into its business additional money, and it raised for that purpose some $75,000 or $80,000. About that time the leading officers in the company consented to a reduction in their salaries, the cut amounting in some cases to 50 per cent. and in others to 40. In January, 1921, the matter was brought to the attention of the salaried employees. They were not asked to consent to a specific reduction of salary. The secretary of the company said to them: "Now, I am not going to ask you to take any specific reduction in salary. I am going to put it up to you as to whether or not, during this period of temporary stress, you will agree or be willing to assist the company by not drawing your full salary, and when we get in shape again we will pay you the part that you haven't drawn. Now * * * it has got to be an entirely voluntary thing. I am not going to say to any one of you men how much you must take or how much you must not take. If any of you feel you cannot take this reduction or make any reduction, I want you to say so frankly." The defendant was present at that conference. On that occasion he stated that he could not at that time agree to anything, but would think the matter over and write the secretary, and on January 6, 1921, the defendant wrote him: "I wish to again say that I am ready and willing to do my share during the present period of depression. * * * I can arrange my affairs to get along for a time with a salary reduction of 25 per cent." It is unquestionable that the company was financially embarrassed and did not meet all of its obligations promptly as they matured, and that matters, instead of improving as time went on, became worse, with the result that in July, 1921, the company admitted in writing its inability to pay its debts and its willingness to be adjudged a bankrupt on that ground. The result was that on July 14, 1921, the company was put into the hands of receivers, and on October 27, 1921, the company was adjudged a bankrupt.

[6] Time in equity is not ordinarily regarded as of the essence of a contract. It is not such a material part of it as must be exactly and strictly complied with to entitle a party to obtain a decree of specific performance. In this respect equity differs from law, for, if one sues at law upon a contract, he must show that he has performed his part of the contract within the period prescribed therein or he cannot recover. In Seton v. Slade, 7 Vesey, 265, Lord Eldon said: "To say time is regarded in this court as at law is quite impossible." But we are not to be understood as intending to assert that time is never essential in equity. All that we mean to assert is that ordinarily time is not regarded in equity as of the essence of the contract. No doubt there are contracts of such a nature that even a court of equity will consider time presumptively an essential and material part of it. Contracts to pay money on a particular day do not belong to the exceptional class, and the general rule is that a default in making the payment on a particular day will not preclude the specific performance of the contract if payment has been actually made on a later day. Longworth v. Taylor, 14 Pet. 172, 10 L. Ed. 405; Pratt v. Law, 9 Cranch, 456, 493, 3 L. Ed. 791; Brashier v. Gratz, 6 Wheat. 528, 5 L. Ed. 322;

Pomeroy on Specific Performance (2d Ed.) § 373; Fry on Specific Performance, 739. And in Bispham's Equity (8th Ed.) § 363, it is said that "time is in equity not generally regarded as of the essence of a contract, and failure on the part of the complainant to comply with his covenants on the exact day will not, necessarily, disentitle him to relief."

In Williston on Contracts, vol. 2, § 845, it is said that "it is, however, desirable to distinguish between a breach of promise to do a thing and a breach of promise as to the time when it shall be done, and courts of equity in England and America have treated stipulations as to time as subsidiary and of comparatively little importance, unless either the language of the parties or the nature of the case imperatively indicated that the date of performance was vital."

In Fry on Specific Performance (5th Ed.) § 1077, that authority states that, "in order to render time thus essential, it must be clearly and expressly stipulated, and must also have been really contemplated and intended by the parties that it shall be so; it is not enough that a time is merely mentioned during which or before which something shall be done."

In Cheney v. Libby, 134 U. S. 68, 10 S. Ct. 498, 33 L. Ed. 818, a contract for the purchase of land provided that the contract should be forfeited if the vendee failed to pay any installment of the purchase price on the very day it became due, and that no court should have power to relieve the purchaser from his failure to strictly and literally comply with his contract. A technical default occurred, and within a very short period thereafter the purchaser made tender of the money due, which the vendor declined to accept, and notified the vendee that he regarded the contract as forfeited. In that case, notwithstanding the default, a decree for specific performance was granted. The court declared: "Even where time is made material, by express stipulation, the failure of one of the parties to perform a condition within the particular time limited, will not in every case defeat his right to specific performance, if the condition be subsequently performed, without unreasonable delay, and no circumstances have intervened that would render it unjust or inequitable to give such relief. The discretion which a court of equity has to grant or refuse specific performance, and which is always exercised with reference to the circumstances of the particular case before it (Hennessy v. Woolworth, 128 U. S. 438, 442 [9 S. Ct. 109, 32 L. Ed. 500])

may, and of necessity must often be controlled by the conduct of the party who bases his refusal to perform the contract upon the failure of the other party to strictly comply with its conditions. Seton v. Slade, 7 Ves. 265, 279; Levy v. Lindo, 3 Merivale, 81, 84; Hudson v. Bratram, 3 Madd. 440, 447; Lilley v. Fifty Associates, 101 Mass. 432, 435; Potter v. Tuttle, 22 Conn. 512, 519. See, also, Ahl v. Johnson, 20 How. 511, 518 [15 L. Ed. 1005]."

[7] A defendant who has waived performance by the plaintiff of some act which the latter was to perform is thereby precluded from setting up the nonperformance as a defense. But in any such case the burden of proving the waiver rests on the plaintiff. Lamare v. Dixon, L. R., 6 H. L. 414.

The courts recognize the rule that, if a party to a contract accepts payments due under it at other times than those contracted for, he thereby waives his right to insist upon a forfeiture for the failure to make the payment and strict accordance with the terms of the contract. In Bronson v. Leibold, 87 Conn. 293, 297, 87 A. 979, the plaintiff had accepted payments of the defendant upon the contract at times other than those contracted for. The court declared that he thereby waived his right to insist upon a forfeiture for failure to comply strictly with the contract. The same rule is announced in the following cases, and others might easily be cited: Texas v. Pensacola Maritime Corporation (C. C. A.) 279 F. 19, 27, 24 A. L. R. 1336; Mound Mines Co. v. Hawthorne, 173 F. 882, 886, 97 C. C. A. 394; Northwest Auto Co. v. Hammond, 250 F. 832, 839, 163 C. C. A. 146, Ann. Cas. 1918E, 461; Farrelly v. United States, 159 F. 671, 86 C. C. A. 539, affirmed in 220 U. S. 321, 31 S. Ct. 406, 55 L. Ed. 481.

Our attention has not been called to any case in which it has been held in equity that a contract can be terminated for a default because of the mere failure to pay money on the exact day the payment was due, if payment was made on a later day and accepted without objection.

[8] But it is said that the District Judge found as a fact that the company was insolvent and unable to meet its obligations as early as September or October of 1920. Assuming that the District Judge was correct in this finding, the fact is wholly immaterial, inasmuch as the salary payments due from it to defendants were paid in full down to and including the month of March, 1921, and it was at that time that defendant was re-

quested to execute a transfer of all the inventions he had made since March 25, 1920. As long as he himself was paid in full it is not a defense of which he can avail himself that the company had not paid, and was unable to pay the claims which other persons held against it.

[9] It is quite true that insolvency may be a good defense to a suit for specific performance. But when it is a defense it is only because it shows that the plaintiff is not in a situation to perform his covenants with the defendant in the particular suit. If he has performed them, so far as the defendant is concerned, the objection that he may not be able to perform those he may have entered into with some one else is no concern of the defendant. Insolvency is an objection of more or less weight, or of no weight at all, depending on the circumstances of the particular case. Neale v. Mackenzie, 1 Ke. 474; Willingham v. Joyce, 3 Vesey. 168. In Buckland v. Hall, 8 Vesey, 92, 95, Lord Eldon said: "With respect to the insolvency, the weight of that objection is more or less in different cases."

In a contract between A. and B. the former asks that the latter be compelled to perform, and shows that he himself is not in default. How can B. excuse his own refusal to perform by setting up that A. owes X. and Y., and has insufficient assets to pay them in full what he owes?

[10, 11] A person who has received the benefits of a substantial performance of a contract cannot at the same time retain the benefits of such performance and defeat a suit for the specific performance of his part of the agreement. "He cannot at the same time affirm the contract by retaining its benefits and rescind it by repudiating its burdens." German Savings Institution v. De La Vernegne Refrigerating Machine Co., 70 F. 146, 150, 17 C. C. A. 34, 38, and cases there cited. And the general rule is that, if a party means to rescind a contract because of the failure to perform it, he must give a clear notice of his intention to do so, unless the contract itself dispenses with such notice, or unless notice becomes unnecessary by reason of the conduct of the parties. Hennessy v. Bacon, 137 U. S. 78, 84, 11 S. Ct. 17, 34 L. Ed. 605.

[12] The fact that the company was insolvent during the entire period of defendant's employment, if that fact be true, did not ipso facto terminate the contract. See Florence Mining Co. v. Brown, 124 U. S. 385, 389, 8 S. Ct. 531, 31 L. Ed. 424. The insolvency of one party may give the other a right to terminate a contract, but the fact in this case is that the defendant did not exercise the right and continued to serve under the contract up to and after this demand was made upon him, and even after the appointment of the receivers and until discharged by order of the receivers on July 28, 1921. He could not claim the benefits of the contract and repudiate its obligations.

[13, 14] The agreement which the defendant made with the company was not to assign at the end of the period of his employment his right to any inventions made by him during that period, or on condition that he continued to be employed by the company throughout the period of five years; but it was an agreement to assign, "whenever required to do so," any inventions made by him while so employed. Moreover, his express agreement was that all inventions made by him during the term of his employment should "at all times and for all purposes be regarded as acquired and held by" him "in a fiduciary capacity and solely for the benefit of the party of the first part (the company)." The only condition attached to this was that the invention should be one made "during the term of his employment." By virtue of this agreement any invention made by this defendant, during the period mentioned, according to the express terms of the agreement, must be regarded "at all times and for all purposes" as held by him "solely for the benefit" of the company. This was not a contract to create a trust, and this suit is not brought to establish a trust. The trust has already been established by the contract itself; and the moment the invention was made, if it was made by defendant during the period described, as we hold it was, the defendant at that very time became a trustee under an executed, and not an executory, trust, as no further instruments were necessary to create the trust itself. What the plaintiffs ask is that a trustee shall be compelled to perform his trust in accordance with his agreement that he would, "when required," execute the necessary "instruments in writing" to transfer the legal title in his invention to those who have succeeded to all the company's right, title, and interest in the invention. The plaintiffs, claiming to be the equitable owners of the invention, are in the court asking that the trustee transfer to them the legal title to the property. If they are the equitable owners, and we hold they are, they cannot be denied the relief they ask.

Judge HAND has not seen this opinion,

but he sat at the argument, was present at the conference upon it, and voted for the reversal of the decree below. He therefore concurs in the result.

The decree is reversed. The District Court is instructed to reinstate the bill and enter a decree as prayed therein, directing the defendant to assign to the plaintiff application serial No. 455,346, application serial No. 514,585, and application serial No. 440,296.