## WESTINGHOUSE ELECTRIC & MFG. CO. v. TRI-CITY RADIO ELECTRIC SUPPLY CO. et al.

Circuit Court of Appeals, Eighth Circuit.
December 28, 1927.

No. 6858.

1. Patents ⊕➝211(1)—License restricting sales to articles of licensee's manufacture held not to license sales of articles manufactured elsewhere than in licensee's works.

Patent license reading, "Licensor hereby grants to licensee a nonexclusive, nontransferable license to manufacture apparatus and to sell apparatus of licensee's manufacture," held to mean that article sold must be manufactured in plants belonging to licensees.

2. Patents ⊕➝211(1)—License to sell patented articles to amateurs, experimenters, and schools held not to permit sales to or through jobbers and dealers.

Patent license, granting licensee nonexclusive, nontransferable license to manufacture and sell apparatus of licensee's manufacture "(a) to radio amateurs for use in radio amateur stations, (b) to radio experimenters and scientific schools and universities for use in experimental or scientific school or university radio stations," held to restrict sales by licensees to users in sense that no sale to independent intermediate dealers, jobbers, or distributors was allowed.

3. Contracts ⊕➝170(1)—Conduct of parties under contract can have no place in construing contract which is clear and complete.

Conduct of parties under contract can have a place in construing contract only where contract is, within its four corners, ambiguous in some respect, but, where contract itself is clear

and complete, there is no room for any extraneous rules of construction.

4. Patents ⊕➝206—Reformation of instruments ⊕➝16—License to use patent is contract reformable to conform to intention, where form attacked is shown to have been executed through fraud or mutual mistake.

A license to use a patent is a contract, and, like other contracts, is subject to reformation to conform to intentions of parties at time of its execution, where form attacked is shown to have been executed through fraud or mutual mistake.

5. Reformation of instruments ⊕➝46—What party's intentions were, and whether patent license was induced by fraud or mutual mistake justifying reformation, were questions of fact.

What intentions of parties to patent license were, and whether contract as executed was induced by fraud or mutual mistake so as to justify reformation, were matters of fact to be resolved from evidence.

6. Patents ⊕➝212(1)—Licensor held estopped to enforce license requirements for manufacture of radio apparatus in licensee's own plant and prohibiting sales to jobbers and dealers.

Evidence held to establish that licensor was estopped by its conduct to claim that license required licensee to manufacture radio apparatus in licensee's own plant, and that license prohibited sales to jobbers or dealers where resales by such jobbers or dealers were limited to classes of users defined by license, where licensor knew that licensee was having article manufactured by others and was selling to jobbers and dealers, and licensor had correspondence direct with some of dealers.

7. Patents ⊕➝213—Licensor held not estopped to claim damages for licensee's sublicensing, not known to lessor.

Licensors held not estopped, by conduct in approving licensee's manufacture of radio apparatus in plants owned by others and in selling articles to jobbers and dealers in violation of license, to claim damages for sublicensing not brought to licensor's attention and not consented to by it.

8. Patents ⊕➝213—Licensor held entitled to licensee's profits under sublicensing arrangement in violation of patent license.

Where licensee made sublicensing arrangement for manufacture and sale of patented radio apparatus in violation of license, whereby licensee was paid stipulated royalty, and licensee paid licensor royalties due under license, licensor held entitled also to balance representing licensee's profits therefrom.

9. Patents ⊕➝214—Where only departure not excused by licensor from patent license was sublicensing for short period, license should not be canceled.

Where only departure from patent license for manufacture and sale of radio apparatus was sublicensing for short period, which was of minor importance, license should not be canceled.

10. Patents ⟐212(1)—Licensor waiving compliance with terms of patent license could insist on future compliance, provided protection be given position of licensees induced by licensor's conduct.

Licensor, waiving compliance with all terms of license for manufacture and sale of radio apparatus, had right at any time to insist on future compliance with license, provided protection be given position of licensees induced by and built on situation as they had right to believe it existed because of licensor's course of dealing.

11. Patents ⟐212(1)—Patent license provision requiring apparatus to be manufactured in licensees' plant previously waived should be enforced, where it could be done without injury to licensees.

Provision of patent license requiring manufacture of radio apparatus in licensees' own plant, which licensor by its course of dealing had waived, should be enforced where licensees' contract with another to manufacture article could be terminated and licensees confined to their own plant without injury to them.

12. Patents ⟐212(1)—Patent license provision requiring sales direct to users, previously waived, should not be enforced where licensee built factory believing they had right to sell to dealers and jobbers.

Provision of patent license, requiring sale of radio apparatus direct to users to be used for certain purposes, should not be enforced where licensor had, by course of dealings, waived such provision, and licensees had built and equipped factory believing they had right under license because of licensor's conduct to sell to dealers and jobbers as they had previously done, but licensees should be permitted to continue to sell to jobbers with condition that such sales embody good-faith arrangement to limit resale to classes of users designated in license and that all apparatus carry clear indication to purchasing user of such limitation.

Appeal from the District Court of the United States for the Southern District of Iowa; Martin J. Wade, Judge.

Patent infringement suit by the Westinghouse Electric & Manufacturing Company against the Tri-City Radio Electric Supply Company and others. From a decree dismissing the bill, plaintiff appeals. Reversed, with instructions.

Stephen H. Philbin, of New York City (Fish, Richardson & Neave, of New York City, and Cook & Balluff, of Davenport, Iowa, on the brief), for appellant.

C. D. Waterman and A. G. Bush, both of Davenport, Iowa (Lane & Waterman and Bush & Bush, all of Davenport, Iowa, on the brief), for appellees.

Before STONE, KENYON, and BOOTH, Circuit Judges.

STONE, Circuit Judge.  This is a bill filed by appellant, as the assignee and owner of a certain patent and a license thereunder, against the licensees. The relief asked is cancellation of the license, an accounting, and such injunctive and other relief as to make these two purposes effective. The basis of the suit is infringement of the patent by operation on the part of the licensees outside of and beyond the terms of the license. Besides placing in issue the material facts alleged in the bill, defendants sought affirmative relief by way of reformation of the license to accord with what they claimed to be the agreement between the parties at the time the license was given. Another plea in the answer was estoppel. The court dismissed the bill on the merits on the ground of estoppel; the affirmative relief in the answer was not acted upon by the court, but it was announced that such prayer in the answer would be reserved for future action if necessity should arise.

The license in question was in writing and there is no dispute as to the contents of the writing nor is there any dispute as to the acts done by defendants under the license. On the merits, there are really three main questions; the first is a construction of the written license; the second is whether the license should be reformed; the third is whether waiver or estoppel was established.

## I. The License.

The patent in question (Armstrong No. 1,113,149, issued October 6, 1914) involves an important feature of radio receiving sets. The license given defendants was as follows:

### "License Agreement.

"This Agreement, made this 17th day of August, 1920, by and between Edwin H. Armstrong, of Yonkers, New York, licensor, and the Tri-City Radio Electric Supply Company, a copartnership formed and existing under the laws of Iowa, and having its principal office and place of business in the city of Davenport and state of Iowa, licensee, witnesseth:

"Whereas, the licensor is the sole owner of United States patent No. 1,113,149, issued on October 6, 1914, for the use of the regenerative circuit with electron discharge tubes; and

"Whereas, the licensee is desirous of acquiring the hereinafter described license under said letters patent:

"Now, therefore, for and in consideration of the sum of ninety ($90.00) dollars, paid to the licensor by the licensee, receipt whereof is hereby acknowledged, and for and in consideration of the mutual covenants here-

inafter set forth, the parties hereto covenant and agree as follows:

"1. The licensor hereby accepts the above-mentioned sum in full payment of all claims against the licensee of what nature so ever, to and including the 1st day of July, 1920; except that under this agreement the licensor does not relinquish any claim for past infringement of United States patent No. 1,-113,149, for apparatus manufactured or sold, by the licensee for or to (a) United States government stations, or (b) United States government controlled stations, or (c) United States government, or (d) United States Shipping Board.

"2. It is agreed that wherever the words 'the apparatus' are used in this agreement, they are intended to cover and include all apparatus in which the regenerative circuit is embodied or employed in conjunction with, or for use with electron discharge tubes; whether for receivers or transmitters or generators.

"3. The licensor hereby grants to the licensee a nonexclusive nontransferable license to manufacture the apparatus and to sell the apparatus of the licensee's manufacture, as follows:

"(a) To radio amateurs for use in radio amateur stations;

"(b) To radio experimenters and scientific schools or universities, for use in experimental and scientific school or university radio stations.

"4. The licensor specifically reserves the right to determine whether or not a sale of apparatus by the licensee comes within the category of licensed uses set forth in clause 3, subdivisions (a) and (b), subject however, in disputed cases, to an appeal to a third party skilled in the radio art, to be designated by both parties and to be agreeable to both licensee and licensor, who shall act as a mediator, and to whom the facts shall be submitted for his decision; and the licensee and licensor hereby agrees to accept and abide by his decision.

"5. For the apparatus manufactured or sold by it under this agreement, the licensee agrees to pay the licensor five per cent. of the licensee's selling price of apparatus sold for the uses set forth in clause 3, subdivisions (a) and (b); and the licensee agrees that it will not manufacture or sell any of the apparatus] to purchasers for purposes other than those set forth in clause 3 hereof.

"6. The licensee agrees that it will keep true and correct accounts showing the quantity of the apparatus manufactured and/or sold by it, which accounts shall be open to inspection by the licensor or his duly accredited agent at all proper and convenient times for the purposes of verification, and the licensee, on the first day of January, April, July and October in each year, will make full and true returns, under oath, to the licensor, of the apparatus sold by it during the preceding quarter, which returns shall show:

"(a) The quantity and description of such apparatus listed in accordance with the subdivisions (a) and (b) of clause 3 hereof; and

"(b) The price at which such apparatus has been sold. Each such return shall be accompanied by a payment from the licensee to the licensor of the royalty shown thereby to be due. Apparatus shall be considered to be sold when billed out, or, if not billed out, then when delivered, or when paid for, if paid for before delivered.

"7. This license shall remain in force to the end of the term of the said letters patent No. 1,113,149, and any reissue or extension of said letters patent.

"8. It is understood and agreed that the license does not extend to any other inventions of the licensor which he may hereafter patent or for which applications for letters patent have been or may be filed; except that under any United States letters patent issued on the licensor's pending United States patent application, serial No. 807,388 or on any division or renewal of such application, the licensee shall have, during the terms of this agreement, and without payment of any royalty in addition to that provided in clause 5 hereof, a like license as is herein granted under the said patent No. 1,-113,149; but it is understood and agreed that payment of royalty under this agreement is in nowise dependent upon the issuance of any patent on the said application, and the term of this agreement is not to be extended beyond the end of the term of said patent No. 1,113,149.

"9. The licensee agrees that each and every piece of the apparatus manufactured or sold by it hereunder, shall be conspicuously marked, by a plate or otherwise, 'Licensed under Armstrong U. S. Patent, No. 1,113,149, October 6, 1914,' together with a short statement embodying either, any or all of the uses set forth in clause 3, subdivisions (a) and (b), and in the event that any United States letters patent issued on licensors's pending United States patent application, serial No. 807,388, that each and every piece of apparatus manufactured or sold by it hereunder and embodying the invention cov-

ered by such letters patent shall be conspicuously marked, by plate or otherwise, also with the number and date of the said letters patent; and the licensee further agrees that in all of its publicity work, such as advertising, catalogues or descriptive literature, describing apparatus using the regenerative circuit with electron discharge tubes it will set forth the fact that it is licensed under the Armstrong United States patent, No. 1,113,-149, and United States application serial No. 807,388, and in describing the circuit arrangement will use the name 'Armstrong Regenerative Circuit.'

"10. This agreement shall not be transferable by the licensee, by operation of law or otherwise, but shall be binding upon and shall inure to the benefit of the heirs, assigns and legal representatives of the licensor."

[1, 2] The particular provisions under dispute in this action are those contained in paragraph 3. That clause defines the scope and extent of the use permitted to defendants by the license. The contention of appellant is that appellees were, by this clause, definitely limited as to the manufacture and as to the sale; that the manufacturing limitation was that they should make the device to be sold by them in their own factories; that the limitations as to sale were, of such products of their own manufacture, direct to amateur or experimental radio users and to such users only for amateur or experimental use. The contention of appellees is that they were empowered to have the patented device manufactured for them by others; that they could sell the device so manufactured for them to jobbers and dealers, who were not their employees or agents so long as the sale to those parties was for amateur and experimental purposes only. The license is clear as to all of these matters; the wording used is accurate and unambiguous. As to manufacture, the license very clearly restricts sales by the licensee to "apparatus of the licensee's manufacture." This provision, in our judgment, means that the article sold must be manufactured in plants belonging to the licensees. In short, the manufacture was to be in such a manner as to obtain the benefit of the skill and personality and integrity of the licensees. As to the sale, the provision contains two limitations: First, it limits the persons or purchasers to whom these licensees could dispose of this apparatus. This limitation is to radio amateurs and to radio experimenters. The second limitation is that it shall be sold, even to such purchasers, only for certain uses by them, to wit, for amateur use as distinguished from commer-

cial usage. While the licensees might make sales through persons who were acting as their agents or employees therein, yet the sale must be direct to the user in the sense that no sale to independent intermediate dealers, jobbers or distributors was allowed.

It seems very clear that the central purpose in the mind of the licensor and expressed in the license was to confine the apparatus to amateur or experimental users and to restrict it from commercial or business users. This purpose was sought to be effectuated, in the expressed terms of the license, by requiring a sale only to persons of those two classes.

This license is a form used by appellant's assignor and, involving other licensees, has been before the Courts of Appeals for the Second and Third Circuits in Westinghouse Electric & Manufacturing Co. v. Cutting & Washington Radio Corporation, 294 F. 671, and Radio-Craft Co. v. Westinghouse Electric & Manufacturing Co., 7 F.(2d) 432. In each of those cases, the provisions of the license here in question were construed. In each, the rights of the licensees to have the patented appliance manufactured by others for them and the rights to sell to distributors, jobbers and dealers were involved. In both cases it was held that the license restricted the sale to direct sales to the users of the classes defined in the license and prohibited sales to intermediaries, such as distributors, jobbers and dealers. The situation as to manufacturer was different in these two cases. In the former, the manufacture was by a different concern but such manufacture was in accordance with specifications furnished by the licensee and was under its supervision. In the latter case, there seems to have been no such supervision. In the former case, the court held the method of manufacture there used within the license saying (page 673):

"We think, however, that one of the purposes of the agreement, in this regard, was to impose responsibility upon the licensee for the character of the work done, so that the business of the licensor would not be injured by the production of inferior apparatus. That responsibility has been met thus far in this case by defendant's arrangement with a competent manufacturer and defendant's supervision."

The latter case held the license required manufacture to be in the licensee's "own plant and by its own employees." We agree with the latter construction for the reasons stated (page 434) in that opinion as follows:

"The license granted the right to manufacture and sell 'the apparatus of the licen-

see's manufacture.' Does this authorize the licensee to have the apparatus manufactured for it by others, or must it manufacture in its own plant by its own employees? It is the general rule that an unrestricted license to manufacture and use or sell implies authority to contract with others to supply what may be lawfully used or sold. Johnson Railroad Signal Co. v. Union Switch & Signal Co., 55 F. 487, 5 C. C. A. 204; Marconi Wireless Telegraph Co. of America v. Simon (D. C.) 227 F. 906. In the last case cited, Judge Hough said: 'A licensee to make and use is not (in the absence of specific language in his license) limited to making with his own hands, in his own shop, or by his own employees. He may employ, procure, or contract with as many persons as he chooses to supply him with that which he may lawfully use, provided such conduct does not change his relation to the licensor.' But, in the case at bar, the license could not be transferred or assigned. The restriction of sales to the 'apparatus of the licensee's manufacture' has some bearing on the question of manufacture. If the licensee could employ others to supply it with the manufactured apparatus, it could not sell that apparatus, and so would have it on its hands. This could not have been the intention of the parties. The limitation of sales to the apparatus of the licensee's manufacture shows, in our opinion, that it was the intention that the licensee should have the apparatus manufactured in its own plant and by its own employees."

[3] Licensees contend that a course of dealing pursued by them with the knowledge and consent of the licensor should be accepted by the court as a practical construction of the license by the parties themselves. But the only place the conduct of the parties can have in construing a contract is as one of the recognized rules or means of construction where the contract is, within its four corners, ambiguous in some respect. Where the contract itself is clear and complete there is no room for any extraneous rules of construction. The court must take the words as it finds them and give them their usual meaning. It cannot alter nor shade such meaning and thus declare that the parties meant other than they plainly stated. This license seems to us to be clear, accurate, complete and unambiguous in its meaning in so far as its provisions are here in issue. If the parties have acted other than the license declared, such action might result in a modification of the license, in a waiver of its requirements or in an estoppel to its enforcement, but such conduct cannot change the clear meaning of the license as written.

It neither is nor can be contended that the licensees acted, for the most part, within the license as above construed. They seek to meet this situation by pleading (1) that the contract should be reformed to accord with a course of dealing which they alleged was contemplated by the parties at the time the license contract was executed and (2) that a waiver or estoppel exists because of the course of action to which the licensor now objects was pursued by them with the knowledge and consent of the licensor.

## II. Reformation of the License.

[4, 5] A license to use a patent is a contract and is, like other contracts, subject to reformation to conform to the intentions of the parties at the time of its execution where the form attacked is shown to have been executed through fraud or mutual mistake. What such intentions were and whether the contract, as executed, was induced by fraud or mutual mistake are matters of fact to be resolved from the evidence. We have carefully read and considered the evidence upon these issues of fact and can discover no basis for this contention made by the licensees.

## III. Waiver or Estoppel.

[6] The licensees do not and could not contend that most of their dealings under the license were within its terms as above construed. Most of the apparatus was not made by them but was made for them in factories not owned, operated or supervised by them. Most of the sales were not made directly to users of the patented appliance but were made to independent dealers or jobbers who, in turn, sold to their own customers in their own way and through their own agencies. Such manufacture and such sales are what the licensor objects to, claims are outside the terms of the license and seeks to recover for and, in the future, to prevent by this action. The licensees plead that the licensor knew and approved the method of having others manufacture the device and of selling it to independent dealers and jobbers and are, therefore and thereby, estopped from now recovering damages or enforcing the license according to its terms. This contention requires an examination of the evidence to determine what the parties did or said in this regard.

Before considering the evidence, it is necessary to dispose of two contentions of appellant. The first is that certain evidence was improperly admitted. This challenged evidence concerns licenses granted to other persons, having no connection with defendants, and what the parties to those licenses did

under them. We find it unnecessary to rule this question as we think the issue of estoppel (in regard to which such evidence was offered) can be clearly determined without any consideration of this evidence as to other licenses.

The other attack upon the evidence is leveled at its sufficiency to establish that the authority of the agent of licensor with whom defendants dealt was such as to make his (or their) knowledge and conduct binding upon the licensor as an estoppel. We have carefully considered all of such evidence and think such authority is abundantly established.

The evidence is voluminous and will be stated herein only in such outline as to reveal the situation as shown to exist. The license is dated August 17, 1920, and provides for reports of sales and payment of royalties on sales, made during the preceding quarter, on January, April, July, and October 1st, respectively. A few days before the license was executed and evidently after negotiations had been practically concluded therefor or, at least, while such were in course, defendants wrote licensor's agent saying they would account for royalties from July 1st, preceding, and inclosing circulars of their business with a request to notify them upon what devices thus shown to be made by them royalties would be claimed. This circular concluded with the words "made by Perfection Radio Laboratory, Clinton, Iowa, sold only by Tresco, Davenport, Iowa, *or other accredited agents, dealers or jobbers.* The Tresco Company is the engineering and sales department of the Perfection Radio Laboratory." The above and all other italics in quotations of the evidence are ours. This letter was answered without any reference to manner of sales. The only value of this circular in connection with the matter now being considered is that it gave information of the methods of sale to dealers and jobbers being then pursued by defendants. September 26, 1921, defendants transmitted check for royalties in a two-sentence letter ending, "This represents 5% of all licensed tuners sold since last report to *jobbers, dealers* and *amateurs.*" In a letter of March 31, 1922, transmitting royalty check, defendants say, "We have sold since the first of the year $1,425.00 worth of tuners to *jobbers* and *amateurs.*" Also, "As all these tuners are made in the writer's basement we feel that this is a good showing. * * *" The agent for licensor answered this letter congratulating defendants on their "showing made in spite of the small quarters in which

you are carrying on business." On September 2, 1922, defendants transmitted royalty reports showing sales during preceding quarter. This report showed 926 tuners sold of which 462 were "sold to J. M. Bell, Davenport, Iowa," and 464 were "sold to Montgomery Ward Co., Chicago, Ill." October 1, 1922, another report was sent showing sales during September, 1922, of 745 tuners of which 344 went to J. M. Bell and 401 "sold to Montgomery Ward Co." These reports were received and acknowledged. October 9, 1922, defendants received a circular letter from licensor's agent suggesting that the word "regenerative" be stamped on their radio sets and requesting certain data for its files. In respect to the first matter occurs the following: "If all of the licensees adopted this word it would stamp their apparatus so as to be recognizable at once *by the dealer* and *the public* as a set in which the Armstrong circuit is embodied legitimately. * * * This will also help to identify unauthorized licensed receivers *to the dealers and purchasing public.*" In answering this circular letter on October 10, 1922, defendants furnished data concerning their business as follows:

"Correct names of company—Tri-City Radio Electric Supply Co., a copartnership known to the trade for seven years as Tresco.

"Partners—Wm. H. Kirwan, Davenport, Iowa. F. M. Bailey, Clinton, Iowa.

"We have main office in Davenport, Iowa.

"We have experimental laboratory—Davenport, Iowa.

"*We manufacture in Tresco Mnfg. Dept. % Briggs and Stratton Co., Milwaukee, Wisc.*

"*We manufacture in the Tresco Mnfg. Dept. of the Standard Equipment Co. of St. Louis, Mo.*

"Partnership formed in Jan. 1914.

"Address W. H. Kirwan, president of Tresco #1416 West Pleasant St., Davenport, Iowa. F. M. Bailey same address.

"We have no catalog. We are making now only five different types of tuners.

"One *for Montgomery Ward Co.* See cut attached.

"One *for J. M. Bell,* who is sales mngr. for Tresco Radio #813 Putnam Bldg., Davenport, Iowa. See inside this letter for cut of this tuner.

"One tuner *for M. McKillip, Chicago, Ill.,* called the Monroe tuner, see cut attached.

"One tuner *for Benwood Inc., St. Louis, Mo.* Cut not ready.

"One telephone made *for Benwood, St. Louis, Mo.* Cut attached."

This letter was written on the first (a blank) page of a four-page pamphlet, page 4 of which contained seven exterior and interior views of a large, fully equipped modern factory with the inscription, "Where Tresco Products Are Made." During October and November, 1922, there was correspondence (too lengthy to be set forth herein) concerning sale of defendants' products by Montgomery Ward Company. This correspondence was between licensor's agent on the one side and Montgomery Ward Company's representative and attorneys (copies being sent to defendants). There was no question made of the right of the defendants to sell to Montgomery Ward Company but the matter insisted upon was the proper marking of the sets to show they were "licensed under Armstrong patent No. 1,113,149," and that the company's catalogues should show this. A part of one of these letters from the licensor's agent is:

"As you perhaps know, the Tresco license agreement specifically provides that all apparatus manufactured and sold by them shall be conspicuously marked, 'Licensed under Armstrong Patent No. 1,113,149,' and in all advertising this fact be mentioned. In order to help Tresco comply with this particular clause of the license agreement, I would suggest that Montgomery-Ward discontinue the circulation of its catalog in the present form and insert in all future catalogs a statement to the above effect."

During November and December, 1922, there was correspondence between the licensor's agent on one side, defendants and another dealer (Harold R. Wakeham & Co. of Chicago) regarding handling of defendants' apparatus. In the course of this correspondence, defendants wrote licensor's agent as follows:

"Refer to your letter of 11/20 to Harold R. Wakeham & Company #835 Washington St., Chicago, Ill. Please be advised that the Wakeham Co. are *our dealers* for Tresco regenerative sets—and sets sold are so marked and conditions of use and sale is on inside of tuner as per tag attached."

The final letter of this Wakeham correspondence is from licensor's agent to defendants and as follows:

"I am very glad to find from your letter of November 28th, that the apparatus *sold by Harold R. Wakeham & Company* of Chicago is Tresco apparatus. You will understand that it was impossible for me to recognize the manufacture of the apparatus in question from the advertisement of Harold R. Wakeham & Company as no mention is made in the advertisement that the apparatus is manufactured by Tresco.

"I should appreciate very much if you would instruct Harold R. Wakeham & Company to advertise the apparatus which it sells as Tresco apparatus."

There was similar correspondence concerning sales to another dealer, the Michigan Radio Corporation, during December, 1922. December 1, 1922, licensor's agent requested copy of contract between defendants and Briggs & Stratton of Milwaukee which was manufacturing sets for defendants. This contract was sent on December 21, 1922. This contract was dated April 13, 1922, and was to continue to end of the year and thereafter until canceled by notice. It provided for the manufacture of the patented device for defendants on a cost plus basis, defendants to furnish specifications, dies, etc., and the manufacturer to ship direct to such consignees as designated by defendants. This contract was received January 3, 1923. January 8, 1923, royalty payment was sent and report showing sales of 2,220 tuners to five different parties of which the principal ones were:

"Sold to J. M. Bell—Tresco Sales — 105
Sold to M. W. Co.—Chicago — 497
Sold to M. W. Co.—Chicago — 604
Sold to Crossley Radio—Cincinnati— 1,000"

To this report was a notation, "Another report in few days on 100 tuners sold the Michigan Radio Corporation not paid for yet." This report was received by licensor's agent, who returned the royalty check for correction as to amount and requesting that the new check include royalty for the 100 tuners sold the Michigan Radio Corporation because, under the license, "apparatus is to be considered sold when billed out," and a check was promptly sent covering the tuners sold to that company. In answer to an inquiry of January 18, 1923, as to details of the arrangement with Crossley, defendants wrote:

"We made 1,000 small sets for Crossley—he furnished the material. Report made to you already on Royalty. He has bought an interest in Precision Equip. Co. who will make these hereafter."

January 20, 1923, the licensor's agent sent notice to the defendants of assignment of the patent and license to the appellant and that subsequent reports and royalty payments were to be made to appellant, and such was done. In many of the letters to defendants from licensor's agent concerning sales to various dealers, it is stated that infringement of the patent is being investigated and proceeded against but there is not a suggestion

that the defendants were exceeding their license in their method of manufacturing or selling. This bill was filed August 17, 1923.

From the above outline of the correspondence between the parties, which is supported further by the oral testimony, we think there can be no question that the licensor knew and approved of the methods employed by defendants. This evidence abundantly establishes an estoppel as to the character of dealings thus brought to the attention of licensor. This estoppel covers manufacture by a separate concern for the account of defendants and sale by defendants to jobbers or dealers where resales by such jobbers or dealers are clearly limited to the classes of users defined by the license, such limitation to be observed in good faith by such jobbers or dealers and to be appropriately indicated upon the devices sold in order that the purchasing users may have clear information of such limitation.

[7, 8] Such estoppel would cover all transactions of manufacture or sale shown by the evidence except such as relate to the Trego or McCrory transactions. Such transactions were of a different business and legal character, were never brought to the attention of the licensor, were never consented to by it and cannot be the basis of an estoppel under this evidence. Trego was a business concern in Kansas City operated under the name of Trego or Trego Radio Manufacturing Company or Trego Company. It was not incorporated. Whether it was a partnership or was owned by a Mrs. Trego is not entirely clear from the evidence. One McCrory seems to have been connected therewith in some way not clear. The scheme attempted to be worked out between the Trego concern and defendants was to have those interested in Trego organize a corporation to be called the McCrory Manufacturing Company. This corporation was to manufacture the patented apparatus upon orders from defendants; such apparatus was to be turned over by this corporation direct to Trego which would sell it; defendants were to be paid a certain percentage of selling price. The practical result of this arrangement was that Trego (hiding under the McCrory Manufacturing Company shell) manufactured the apparatus and, in its own name, sold the same paying defendants a stipulated royalty for the privilege. This was nothing more nor less than a sublicensing by defendants. This arrangement was carried out except that the McCrory Company was not organized. It was of short duration—lasting from January 27, 1923, to April 7, 1923—during which time about

1,000 sets were sold and royalties paid to defendants of $1,575.57. Out of this sum the royalties due the licensor under the license were paid. The balance represents defendants' profits therefrom and there should be a decree against them for such balance with interest from the date of such decree until paid.

The above estoppel bars all accounting or recovery except as just indicated.

[9] As the only departure (not excused by licensor) from the license is the Trego transactions; as that may be requited as above determined and as it was of minor importance, we think the license should not be canceled.

[10-12] Whether an injunction should issue limiting the future operation of defendants under the license requires consideration and must be governed by the situation of the defendants, as induced by the estoppel, at the time this bill was filed. The licensor had a right at any time to insist upon future compliance with the license provided protection be given the position of the licensees, induced by and built upon the situation as they had a right to believe it existed because of the course of dealing which was the subject of the estoppel. The situation revealed by the evidence is that, when the case was tried, the only concern manufacturing for the defendants was the Pfanstiehl Radio Service Company under a contract made June 1, 1923, for thirteen months and thereafter until terminated by either party at the end of any calendar month on three months' prior written notice. This contract is of a character that it can be terminated now by defendants (if it is yet in force) without any liability upon them because of such termination. After the course of dealing had proceeded for some time during the estoppel period, defendants, in reliance upon the situation which they thought and were justified under the estoppel in thinking existed, erected and equipped a factory plant of their own at an expense of about $4,000.00. Apparently, this expenditure involved the outlay of their available means, including money belonging to the wife of one of the defendants. Two things are obvious from this situation: First, the Pfanstiehl contract for manufacture can be terminated and the defendants confined to their own plant without injury to them. Thus, the license can be complied with and enforced in accordance with its meaning as to manufacture. This should be done. Second, defendants had never made extensive sales direct to users but their business had always been conducted through sales to dealers or

jobbers. It is not conceivable that they would have made the above expenditure for an equipped factory had they not believed they had the right, under the license, to sell to dealers and jobbers as they had always done and as they had a right to believe, because of the conduct of licensors' agent, they could properly do. To force now a compliance with the license to sell direct to users would mean the loss of this investment and would result ruinously to them. It would be inequitable to require such. The only way to protect their rights is to permit them to continue to sell to jobbers and dealers with the conditions that such sales embody good-faith arrangement or contracts to limit resale to the classes of users designated in the license and that all apparatus carry a clear indication to the purchasing user of such limitation.

The result of the above determinations is that the decree should be reversed with instructions to set aside the dismissal of and reinstate the bill, to render a decree for the difference between $1,575.57 received by defendants, and the royalties on such sales paid to the licensor (unless the parties can agree upon this amount, evidence may be taken upon that single issue), to enjoin defendants from having the patented apparatus manufactured otherwise than by themselves, to enjoin defendants from selling such apparatus except upon contracts limiting resale, by their purchasers, to other than the classes of users designated by the license and upon clear indication to the purchasing user upon the sets sold by them of such limitations and to otherwise deny the prayers of the bill for relief.

The costs to date in the trial court and the costs in this court to be borne equally by the two parties.