**REPUBLIC ENGINEERING & MANUFACTURING COMPANY, a Corporation, Plaintiff-Respondent,**

**v.**

**Milton A. MOSKOVITZ, Micro Precision Engineering Company, a Corporation, and Apex Metal Products Co., a Corporation, Defendants-Appellants,**

**and**

**Harry Frankel, Defendant, Cross Claimant-Respondent.**

**No. 31424.**

St. Louis Court of Appeals.

Missouri.

March 17, 1964.

Motions for Rehearing or Modification or Clarification and to Transfer to Supreme Court Denied April 13, 1964.

Edmund C. Rogers, John T. Rogers, Clayton, Ben V. Zillman, Hilmar L. Lax, St. Louis, for defendants-appellants.

Ralph W. Kalish, St. Louis, for defendant-respondent.

Malcolm I. Frank, Bernard Mellitz, Frederick M. Woodruff, St. Louis, for plaintiff-respondent.

DOERNER, Commissioner.

This is an action in equity involving two written contracts. Plaintiff Republic Engineering & Manufacturing Co., the licensee under a patent license agreement, filed its petition praying that defendants Moskovitz, Micro Precision Engineering Co., and Apex Metal Products Co. be enjoined from continuing their breach of the license agreement. Named as only a nominal party in plaintiff's petition, defendant Frankel filed a cross-claim against defendant Moskovitz in which he asked that, in accordance with a contract between them, Moskovitz be compelled to assign to him an interest in certain patent applications. This appeal is brought by defendants Moskovitz, Micro Precision, and Apex Metals from a final judgment and decree granting certain relief to plaintiff Republic Engineering and cross-claimant Frankel. In the interest of clarity we will consider first the appeals as they relate to plaintiff's complaint.

The facts essential to a decision of the plaintiff's claim are these: defendant Moskovitz is an experienced inventor of automotive parts, including ball joints for front wheel suspension assemblies, in which field he considers himself an expert. In 1950 Moskovitz and cross-claimant Frankel organized a corporation named Republic Engineering & Manufacturing Co. This company was not the plaintiff corporation, and to distinguish between them it will be referred to as Old Republic. Frankel contributed the money to launch Old Republic, and for his part Moskovitz permitted it to manufacture and sell, under an unwritten license, certain automotive replacement parts which Moskovitz had invented. In 1953 Old Republic was operating at a loss. Moog Industries, Inc., a manufacturer of automobile parts for the replacement mar-

ket, as distinguished from the original equipment market, was not then making ball joint suspension devices but desired to enter that field. To that end it entered into negotiations with Old Republic and its owners, Moskovitz and Frankel. As a result, Old Republic changed its name to Neo-Tech Engineering & Manufacturing Co., Moog formed a wholly owned subsidiary, the plaintiff, Republic Engineering, and two contracts were executed, both on June 17, 1953. The first was an agreement between Neo-Tech as Seller, plaintiff Republic Engineering as Buyer, and Moskovitz and Frankel as Guarantors, whereby Neo-Tech sold its physical assets and good will to plaintiff for $166,884.37. The only portion of this sales contract which is pertinent to the present litigation is paragraph 7 thereof, which reads:

> "7. Seller and Guarantors and each of them, jointly and severally, agree that for the period of five (5) years from and after the date of this Agreement neither Seller nor Guarantors nor any of them will become interested or participate, directly or indirectly, as owner, employee, stockholder, partner, sales agent, or in any other manner, in any business operating in the United States of America or any part thereof which business in any way competes in the replacement market with the lines of motor vehicle merchandise described as follows: tie rod ends, drag links, ball joint suspension parts, all front end parts, piston rings, leaf springs, coil springs, king bolts and shackles."

Coincidently with the execution of the sales contract a second written instrument titled "License Agreement" was entered into by Moskovitz, Frankel and Neo-Tech, as licensors, and plaintiff Republic Engineering, as licensee. The pertinent terms of that agreement will be quoted later. It is presently sufficient to say that the agreement granted plaintiff Republic Engineering the exclusive right to make, use and sell certain automotive devices designed, or to be designed in the future, by Moskovitz, in

consideration of the promise of Republic Engineering to pay specified royalties. In addition, the agreement provided that Moskovitz was to work for plaintiff Republic Engineering until December 31, 1953, at a salary of $100 per week.

Following the execution of the sales contract plaintiff took over the machinery, tools, equipment and inventory of Neo-Tech and engaged in the manufacture and sale of some, but not all, of the devices that had previously been produced by Neo-Tech. The employment of Moskovitz by plaintiff did not terminate on December 31, 1953, as contemplated by license agreement, but continued on until August, 1956, when Moskovitz severed the relationship following an altercation with one Cole, the works manager of Moog Industries.

Thereafter, apparently around the early part of 1960, Moskovitz undertook to design other ball joints. His efforts culminated in the development of two types of such devices for replacement purposes, one for General Motors cars and the other for Chrysler made automobiles. We will refer to them collectively as the Moskovitz ball joints. Sometime in February, 1960, Perfect Equipment Corporation of Kokomo, Indiana, which dealt in automotive replacement parts, learned of the development of the Moskovitz ball joints and entered into negotiations with Moskovitz. As a result, Moskovitz caused the defendant Micro Precision Engineering to be incorporated, the stock of which is wholly owned by him. On June 10, 1960 Micro Precision and Perfect Equipment entered into a written agreement in which it was recited that Micro Precision made or had made for it "certain devices" useful with existing automobiles. Micro Precision agreed to sell such devices exclusively to Perfect Equipment, and Perfect Equipment agreed to buy exclusively from Micro Precision in such quantities as it might need. Significantly, the phrase "ball joints for front end suspensions" or similar language was not used in the agreement, and nowhere therein is there any description of the so-called "devices." Dur-

ing the course of the negotiations Moskovitz told the representatives of Perfect Equipment that he had formerly worked for Moog Industries (plaintiff's parent company) and that he had designed Moog's ball joints but had severed the relationship. He did not, however, inform them that he had entered into a license agreement with plaintiff Republic Engineering, nor did he discuss patents.

Although Perfect Equipment had only a sample ball joint, immediately after the execution of the contract with Micro Precision it endeavored to sell the Moskovitz ball joints, and took orders pending delivery. Some indication of Perfect Equipment's success may be gathered from the fact that the initial order it placed with Micro Precision was for 10,000 units for one make of car, and its second order was for 42,000 units for four other makes. Both of these orders were placed with Micro Precision before or about the time defendant Apex Metal Products, which manufactured the ball joint assemblies for Micro, made its first shipment.

Plaintiff first learned of the development of the Moskovitz ball joints in February, 1961 when they were exhibited in Perfect Equipment's booth, manned by Moskovitz, at the annual show of the Automotive Service Industry Association in Los Angeles. Shortly thereafter plaintiff obtained some of the Moskovitz ball joints which Perfect Equipment was selling, examined and tested them, and reached the conclusion that they came within the scope of the exclusive license agreement which Moskovitz had granted to it. By a letter dated March 28, 1961, plaintiff Republic advised Moskovitz that it understood that he had evolved substantial improvements in tie rod ends and ball joint designs coming within the scope of its exclusive license agreement, and that he was producing and selling them. Plaintiff demanded that Moskovitz supply it with all pertinent information regarding such improvements, which it claimed he was obligated to do under its license agreement, and that he cease and desist from producing and

selling such devices in violation of that contract. Moskovitz did not answer plaintiff's letter. Plaintiff thereupon caused applications for patents on the Moskovitz ball joints in the name of Moskovitz to be prepared, and requested Moskovitz to sign the applications. He refused to do so on the grounds that the Moskovitz ball joints were not new or novel, and that they therefore were not patentable. As authorized by the patent laws, 35 U.S.C.A. § 118, plaintiff Republic thereupon filed the unsigned applications with the Patent Office, supported by affidavits as to its interests. The evidence showed that the applications were pending at the time this cause was tried. Plaintiff also learned that Moskovitz or Micro Precision was having defendant Apex Metal Products manufacture the Moskovitz ball joints. By a letter dated April 24, 1961 plaintiff advised Apex that under plaintiff's license agreement with Moskovitz it had the exclusive right to make and sell the ball joint devices which Apex was making, warned Apex that it was aiding and abetting Moskovitz to breach his contract, and called upon Apex to stop manufacturing such devices forthwith, on pain of being held responsible. Apex was advised by Moskovitz' lawyer to pay no attention to the letter. It did not discontinue making the Moskovitz ball joints until around August 1, 1961, more than two months after plaintiff Republic had filed its petition herein on May 17, 1961.

On the same day plaintiff's petition was filed an order to show cause was issued. After a hearing thereon, and on condition that plaintiff post a bond for $75,000, which was filed, the court on August 21, 1961 issued a temporary injunction restraining and enjoining the defendants from manufacturing and selling the Moskovitz ball joint devices. Trial on the merits began on October 9, 1961 and was completed on November 8, 1961. It was developed by the evidence that between the time the temporary injunction had been granted and the trial begun Moskovitz and Micro Precision had shipped to Perfect Equipment in Indi-

ana all of the tools, dies and other equipment used in the manufacture of the Moskovitz ball joints.

On May 28, 1962 the chancellor entered an interlocutory decree, appointed a referee for the purpose of determining plaintiff's damages, and specifically reserved jurisdiction for further proceedings. Subsequently the parties filed a stipulation wherein they agreed that the court should assess damages of $2,000 in favor of plaintiff and against defendants Moskovitz and Micro Precision as the result of the sale of the Moskovitz ball joints sold up to May 28, 1962. Reservations regarding the non-prejudicial effect of the stipulation were incorporated therein. The next day, July 10, 1961, the chancellor entered his final judgment, order and decree. The essence of his findings which are pertinent to defendants' appeal (as to plaintiff's claim) were that the license agreement is a valid, legal and enforceable contract, and is not in restraint of trade, as claimed by defendants; that the scope of the agreement included all ball joint devices designed by Moskovitz, whether patentable or unpatentable (an issue which the trial court expressly declined to decide); that the Moskovitz ball joints were in fact improvements in such devices; and that by making and selling them through Micro Precision, which he controlled, Moskovitz, aided and abetted by Apex, was violating plaintiff's exclusive license agreement. By the decree Moskovitz, Micro Precision, and Apex were restrained and enjoined from manufacturing and selling, directly or indirectly, the Moskovitz ball joints; Moskovitz and Micro were ordered and directed to return to the custody of Moskovitz in St. Louis, the tools, dies and other equipment previously used by Apex in the manufacture and assembly of the Moskovitz ball joints, and to retain the same; the counterclaim of Moskovitz and Micro Precision by which they sought to have plaintiff's exclusive license agreement declared invalid was denied; and plaintiff was awarded a judgment for $2,000 against Moskovitz and Micro Precision.

■ While the defendants have raised eight points in their brief, some of which contain as many as four subpoints, the fundamental issues we are called upon to decide involved the proper construction of the agreement, its validity, and the propriety of the relief granted plaintiff. This is true because the very foundation of plaintiff's claim for relief is its exclusive license agreement. Preliminarily it is appropriate to point out that while they are recognized by statute, 35 U.S.C.A. § 261, license agreements are purely contractual in nature. Contour Chair-Lounge Co. v. Laskowitz, Mo., 330 S.W.2d 817; Westinghouse Electric & Mfg. Co. v. Tri-City Radio Electric Supply Co., 8 Cir., 23 F.2d 628; Ellis, Patent Licenses, 3rd Ed., Sec. 1, p. 2. And that the usual principles of contract law govern the construction of such agreements. United States Industries, Inc. v. Camco, Incorporated, 5 Cir., 277 F. 2d 292; 69 C.J.S. Patents § 249, p. 770; Ellis, supra, Sec. 1, p. 2.

The initial issue on which the parties divide involves the habendum and certain of the recital or whereas clauses of the license agreement. Paragraph 2, the habendum, reads:

"2. Licensors jointly and severally grant to Licensee the exclusive right and license to make or have made, use and sell throughout the United States, under the hereinbefore designated patent and patent applications, including any reissue, divisional, continuation applications filed or patents issuing thereon, and under any and all future improvements made or acquired by said Licensors or either of them, movable joint devices as described on pages 2 and 3 hereof for any of the purposes hereinbefore specifically or generally stated, such exclusive rights, however, to be limited to the 'replacement' market, as that term is under-

stood in the trade and as distinguished from the 'original equipment' market.
* * *"

The "hereinbefore designated patent and patent applications" referred to in paragraph 2 are described in the first two recital clauses as letters patent No. 2,569,823 issued to Moskovitz and Frankel on October 2, 1951, entitled "Self-Lubricated Steering Knuckle Joint"; application for letters patent Serial No. 210,247 filed by Moskovitz on February 9, 1951, entitled "Joint"; and application for letters patent Serial No. 235,780 filed by Moskovitz on July 9, 1951, entitled "Lubricant Sealed Tie Rod Joint." It will be noted that in addition to a license on the enumerated patent and patent applications, by paragraph 2 plaintiff as licensee was also granted an exclusive license on "* * * any and all future improvements made * * * by said Licensors * * * (on) movable joint devices as described on pages 2 and 3 hereof * * *." This is a reference to the sixth paragraph of the recitals which appear on pages 2 and 3 of the agreement, and provides:

"AND WHEREAS, the Licensee is desirous of obtaining the exclusive right to manufacture, use and sell movable joint devices covered by any or all of the above identified patent and patent applications and any and all improvements in movable joints made or acquired by said Licensors, or either of them, in and for the purpose known in the trade as the 'replacement' market as distinguished from the 'original equipment' market. As presently understood, movable joint devices to be made or contemplated to be made will be of the ball type or substantially equivalent universally or semi-universally movable types of joints suitable in and to be used for one or more of the following purposes:

"1. For automotive steering assemblies including steering arm joints, drag link ends, and tie rod ends;

"2. For automotive wheel mounting and suspension assemblies including ball joint mounting and suspension parts;

"3. Movable joint devices for other automotive parts, mountings, and assemblies; but this enumeration of purposes is illustrative only and does not limit the generality of this license to cover all of the aforesaid types of movable joint devices covered by any present or future patent or patent application owned or acquired by said Licensors or either of them."

Defendants contend that the agreement should be construed as granting a license on only those future improvements which are advancements or betterments of the patent and patent applications enumerated in the first two recital clauses. But neither paragraph 2, the granting paragraph, nor any other clause contains any words of limitation restricting the scope of the license to improvements on the specified patent and patent applications, as in Meissner v. Standard Ry. Equipment Co., 211 Mo. 112, 109 S.W. 730, cited by defendants. On the contrary, the reference in paragraph 2 is to improvements in movable joint devices "as described on pages 2 and 3 hereof * * *"; and what is described on those pages is what may be called a field or type of such devices, defined therein as "* * * of the ball type or substantially equivalent universally or semi-universally movable types of joints * *." Certain purposes for which such types of movable joint devices may be suitable for use in automobiles are mentioned, but the broad scope of the improvements included in the license is ensured and emphasized by the concluding admonition that "* * this enumeration of purposes is illustrative only and does not limit the generality of this license to cover all of the aforesaid types of movable joint devices * * *." When, as here, the language of a contract is clear and unambiguous there can be no construction of it because there is nothing

to construe. Leggett v. Missouri State Life Ins. Co., Mo., 342 S.W.2d 833; Mickelberry's Food Products Co. v. Haeussermann, Mo., 247 S.W.2d 731.

The second issue on which the parties differ also involves paragraph 2 and the sixth clause of the recitals, as well as other parts of the contract. Defendants argue that if the agreement is to be interpreted to encompass improvements in the *field* of movable joint devices it must be construed to include only those improvements which are patentable; that the burden of proof was on plaintiff to prove the patentability of the Moskovitz ball joints; that plaintiff failed to meet its burden; and that in fact the evidence showed that such ball joints would not meet the requirements of patentability laid down in 35 U.S.C.A. § 101 et seq. It would appear that in the court below plaintiff apparently accepted defendants' challenge regarding the patentability of the Moskovitz ball joints, for considerable testimony was elicited from the expert witnesses of both parties regarding the nature of the improvements inherent in such ball joints, and their patentability. However, the chancellor expressly declined to rule on the patentability of the Moskovitz ball joints. He held that it was unnecessary to do so because the license agreement included all improvements made by Moskovitz in the field of movable joint devices, whether patentable or unpatentable; and that the ball joints in question were in fact improvements in that field. Whatever may have been its position below, plaintiff here contends that under the agreement its exclusive license covers all improvements made by Moskovitz in the foregoing field, regardless of their patentability. The parties seem to agree that the Moskovitz ball joints are improvements in the field of movable joint devices. Thus what we are called upon to decide is the scope of the agreement.

■ The cardinal rule for the construction of contracts is to ascertain the intention of the parties, from a consideration of the four corners of the instrument, if that is possible, and to give effect to that intention. St. Louis Union Trust Co. v. MacGovern & Co., 297 Mo. 527, 249 S.W. 68; Kalen v. Steele, Mo.App., 341 S.W.2d 343; 17A C.J.S. Contracts § 296(1), p. 69. With that primary rule in mind we turn to an examination of the agreement in question to determine therefrom, if we can, the intention of the parties as of the time they entered into their contract.

■ We find the first such indication of intention in paragraph 2. It will be recalled that by that paragraph, previously quoted, Moskovitz granted plaintiff an *exclusive* license on certain enumerated patent and patent applications, and on future improvements in the field of movable joint devices. Only the issuance of a patent gives an inventor the right to exclude others from appropriating his invention, and that for only a limited time. 35 U.S.C.A. § 154; Bloomer v. McQuewan, 14 How. 539, 14 L. Ed. 532. Because it is the patent which confers a monopoly upon the patentee. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122. Under the common law an inventor does not have any special right to his invention, except, perhaps, to keep it a secret. Walker on Patents, Dellers Ed., Vol. 3, Sec. 220, p. 1152; Hopkins on Patents, Vol. 1, Sec. 3, p. 7. He has, of course, the right to make, use and vend his own invention, but if he voluntarily discloses his invention, as by offering it for sale, the world is free to copy and use it with impunity. Restatement of the Law of Torts, Sec. 757; Reddi-Wip, Inc. v. Lemay Valve Co., Mo.App., 354 S.W.2d 913. The right of exclusion is so dependent on a patent that even though an inventor has applied for a patent he cannot maintain an action for infringement prior to the time it is issued. Gayler v. Wilder, 10 How. 477, 51 U.S. 477, 13 L.Ed. 504. While he and his assignee or licensee may have an inchoate right to its exclusive use, the potential right does not become a reality until the patent is actually issued. Gayler v. Wilder, supra. The evidence is un-

disputed that the license agreement was prepared by competent patent counsel. In view of the foregoing state of the law it would appear obvious that when Moskovitz attempted to grant, and plaintiff to obtain, an *exclusive* license on future improvements they had in mind only those improvements which would be patentable. For Moskovitz could not grant that which he did not have, or could ever acquire, and neither he nor plaintiff, his licensee, could ever have or acquire the right to exclude others unless and until a patent was actually granted on his improvement.

A second indication of the intention of the parties appears in the foregoing sixth recital clause. The license granted by paragraph 2 was not to "all future improvements" but to "* * * all future improvements * * * as described on pages 2 and 3 hereof * * *," a reference to the sixth clause of the recitals. While the words "all future improvements" appear in the forepart of that clause, immediately following the illustrations used appears the following: "* * * but this enumeration of purposes is illustrative only and does not limit the generality of this license to cover all of the aforesaid types of movable joint devices *covered by any present or future patent or patent application owned or acquired by said Licensors or either of them."* (Emphasis supplied.) The term "future patent" obviously means a patent actually issued to Moskovitz. The words "future * * * patent application * * *" can only refer to an improvement honestly and conscientiously deemed to be patentable. For an application cannot legally be filed on an invention known by the inventor to be unpatentable. 35 U.S.C.A. §§ 101–103. And one who makes an application for a patent known to him to be unpatentable makes a false and perjured oath. 35 U.S.C.A. §§ 111, 115. Therefore the language emphasized clearly indicates, we believe, that it was the intention of the parties to the agreement to limit its scope to only those future improvements which were patentable.

Further indications of that intention appear in other provisions of the contract which are made to depend on the matter of patentability. Thus by paragraphs 4, 5 and 6 plaintiff agreed to pay royalties on the net sales of only those future improvements "* * * covered by * * * any patent applications filed or acquired by Licensors and patents obtained thereon or otherwise acquired by Licensors * * *." By paragraph 18 the licensors agreed to apply for and diligently attempt to obtain patents on "all improvements"—a covenant which, as we have pointed out, they could not legally fulfill if the improvement was not patentable. Even the duration of the license agreement is made to depend upon the issuance of a patent on a future improvement, for paragraph 20 provides that the contract shall extend for the life of the issued patent or "* * * for the life of the last to expire of any patent which may issue on any patent applications which may be filed hereafter on applicable improvements acquired or made by Licensors coming within the scope of this license agreement * * *." In short, the theme of patentability appears again and again throughout the length of the agreement.

Lastly, to construe the contract as contended for by plaintiff would lead to an absurd result, and would give the contract the effect of an unreasonable contract not to compete. As we have heretofore pointed out, unless the future improvement on which the license was granted is patentable, neither Moskovitz nor plaintiff have any right to exclude others from making or selling it. Were we to construe the scope of the agreement as including unpatentable improvements, as plaintiff requests, the result would be that any one could make and sell the improvement—except Moskovitz. In effect this would convert the license agreement as to future improvements into a compact on the part of Moskovitz not to compete with plaintiff. This despite the fact that that subject was expressly covered in the sales contract executed coincidently with the license agreement. Since the li-

cense will extend to at least 1972, and since the area included is not limited but extends to the entire United States, such a contract would be unreasonable and therefore unenforceable in a court of equity. Mallinckrodt Chemical Works v. Nemnich, 169 Mo. 388, 69 S.W. 355; Renwood Food Products v. Schaefer, 240 Mo.App. 939, 223 S.W.2d 144; Reddi-Wip, Inc. v. Lemay Valve Co., Mo.App., 354 S.W.2d 913.

A patentee may, of course, assign a patent or license another thereunder, and as part of his contract may legally agree that the assignment or license shall extend to and include future patentable improvements. Littlefield v. Perry, 21 Wall. 205, 22 L.Ed. 577; Transparent-Wrap Mach. Corp. v. Stokes & Smith Co., 329 U. S. 637, 67 S.Ct. 610, 91 L.Ed. 563; Ellis, Patent Licenses, 3rd Ed., Sec. 3, p. 4. The rationale by which the contract to assign or license future improvements is justified is that an improvement may jeopardize or destroy the value of the patent assigned or the license granted, and that the purpose of the agreement is to safeguard the future of the assignees or licensee's business. Printing & Numerical Registering Co. v. Sampson, L.R., 19 Eq. 462; Chadeloid Chem. Co. v. H. B. Chalmers Co., 2 Cir., 243 F. 606; A. B. Dick Co. v. Fuller, 2 Cir., 198 F. 404; Reece Folding Mach. Co. v. Fenwick, 1st Cir., 140 F. 287, 2 L.R. A.,N.S., 1094; Aspinwall Mfg. Co. v. Gill, 3 Cir., 32 F. 697; Consolidated Ry. Elec. Lighting & Equipment Co. v. United States Light & Heating Co., 77 N.J.Eq. 285, 78 A. 684. Equity will therefore enforce such a contract when the improvement is *patentable*. Transparent-Wrap Mach. Corp. v. Stokes & Smith Co., supra; Chadeloid Chem. Co. v. H. B. Chalmers Co., supra; A. B. Dick Co. v. Fuller, supra; Flakice Corp. v. Short, 2 Cir., 115 F.2d 567. But no case has been cited to us, nor has our research disclosed one, in which an agreement to assign or license a future *unpatentable* improvement was enforced. Since the assignor or licensor of the original patent would have no right or title to an unpatentable improvement which he could convey, a court of equity would not require a futile act by ordering him to convey that which he does not own. Kennedy v. Hazelton, 128 U.S. 667, 9 S.Ct. 202, 32 L.Ed. 576; Crook v. Bendix Aviation Corp., D.C., 68 F.Supp. 449.

In the light of the foregoing it is our opinion that when the intention of the parties as of the time they executed the license agreement is gathered from a consideration of the entire instrument, Industrial Bank & Trust Co. v. Hesselberg, Mo., 195 S.W.2d 470, the conclusion is inescapable that the scope of the contract was intended to be limited to those future improvements which were patentable.

However, our conclusion regarding the scope of the license agreement is not to be considered as a blanket approval of all of Moskovitz' actions. On the contrary, it is obvious that in certain respects he breached the contract, as the chancellor found. We concur with the chancellor's opinion that by the terms of the contract Moskovitz was under the duty to inform the plaintiff of all improvements he designed in the field of movable joint devices for automotive replacement purposes, and to furnish plaintiff with drawings disclosing the same, whether or not he considered the improvement to be patentable. He failed and refused to do so. We also share the chancellor's view that by paragraph 13 of the license agreement plaintiff has the right to make the initial decision regarding the patentability of a movable joint device submitted to it by Moskovitz. The evidence is clear that plaintiff considered the Moskovitz ball joints to be patentable improvements in the art, and there is nothing in the record to indicate any unreasonableness or lack of good faith in its part in reaching that decision. By the same paragraph, when requested to do so, Moskovitz is obligated to apply for and diligently attempt to obtain a patent on a device designed by him which plaintiff in good faith decides is patentable.

Plaintiff requested Moskovitz to apply for a patent on the subject ball joints, but he refused to do so on the grounds that they were not patentable. But it is apparent that when the parties entered into the agreement they recognized that there might be honest differences of opinion arise between them on the question of patentability, for it is further provided in paragraph 13 that if Moskovitz does not prosecute an application for a patent, plaintiff has the right to " * * attempt to procure patents of the United States on such improvements as are thought to be patentable by Licensee * * *." While plaintiff originally prayed that Moskovitz be required to cooperate with it in the prepartion of patent applications, and to sign them, this issue apparently became moot when thereafter plaintiff availed itself of its right to apply for a patent. The plaintiff's evidence showed that its application had not been finally passed on and was still pending in the Patent Office at the time the case was tried and submitted. So far as we know from what is before us, it remains in that status.

The remaining equitable relief sought by plaintiff was an injunction restraining defendants Moskovitz, Micro Precision, and Apex Metals from violating the license agreement by making and selling the Moskovitz ball joints. The judgment and decree granting such relief is vigorously attacked by those defendants. Assuming that the continuing breach of the contract was such as a court of equity might enjoin, it is apparent that plaintiff was entitled to relief only if the Moskovitz ball joints were within the scope of the license agreement. Viewing the contract in the light of the construction we have given it, such ball joints are not within the scope of the agreement unless they are patentable. Thus the ultimate and decisive question in plaintiff's claim for relief is whether Moskovitz ball joints are patentable. This issue the chancellor expressly declined to decide. We are of the opinion that because of the circumstances presently existing in this case we are without jurisdiction to resolve that issue.

By Art. I, Sec. 8 of the Constitution of the United States, Congress is given the power to promote the progress of science and the useful arts by granting to an inventor for a limited time the exclusive right to his discovery, and to make all laws necessary and proper for carrying that express power into execution. While other Federal officers were originally authorized to issue patents, Butterworth v. Hoe, 112 U.S. 50, 5 S.Ct. 25, 28 L.Ed. 656, in 1836 Congress created the Patent Office, the chief officer of which was called the Commissioner of Patents, Act of July 7, 1836, Ch. 357, 5 Stat. 117. A comprehensive procedure was provided therein for passing on applications for patents. By that Act it was made the duty of the Commissioner to issue a patent if he deemed the invention to be sufficiently useful and important, and since 1839 (Act 1839, Ch. 88, 5 Stat. 354) the decision of the Commissioner as to the patentability of an invention, so far as the Patent Office is concerned, is final and conclusive. Appeals were provided from his decision, however, by an unsuccessful inventor and in interference cases. See Butterworth v. Hoe, supra; United States ex rel. Bernardin v. Duell, 172 U.S. 576, 19 S.Ct. 286, 43 L.Ed. 559. In general, the procedure established and the authority of the Commissioner of Patents remains the same today. 35 U.S.C.A. §§ 101, 131. It has been said that " * * * in deciding whether a patent shall issue or not, the commissioner acts on evidence, finds the facts, applies the law, and decides questions affecting not only public but private interests; * * * and in all this he exercises judicial functions." United States ex rel. Bernardin v. Duell, 172 U.S. 586, 19 S.Ct. 289, 43 L.Ed. 559. See also Butterworth v. Hoe, 112 U.S. 59, 5 S.Ct. 29, 28 L.Ed. 656, where it was said that the action of the Commissioner in passing upon the patentability of an invention is " * * * essentially judicial in its character * * *."

According to plaintiff's own evidence, it has applied for a patent on the Moskovitz ball joints, as it had a right to do under the license agreement when Moskovitz refused to apply. So far as the record before us shows, that application is still pending, and no final determination of patentability has been made by the Commissioner of Patents. Thus what we would be required to decide, were we to pass upon the patentability of the Moskovitz ball joints, is the very question presently pending before the Commissioner. This we cannot do. Congress has given the sole authority to the Commissioner of Patents to *initially* make that decision. As was said in Hoeltge v. Hoeller, 12 Fed.Cas. 289, Fed. Cas. No. 6,574, 2 Bond, 386: "* * * It is made, by law, the official duty of the commissioner of patents to pass upon all applications for patents, and a court can not anticipate his action by taking jurisdiction of the question, whether a pending application for a patent will or will not be granted." And in Standard Scale & Foundry Co. v. McDonald, Cir.Ct., W.D.Mo., 127 F. 709, it was held that an applicant for a patent, while his application is pending, could not sue in equity to enjoin the defendant from using the invention even though it was shown that the applicant was the original inventor and that the defendant had by fraud secured a patent to the invention. There it was said that, "* * * it never was the mind of Congress that the inventor, without complying with the statutory scheme of submitting his claim to the Patent Office for its action thereon, could go into a United State court in the first instance to have determined the question of his right to a patent, and the exclusive use of the claimed invention." (127 F. 710). Since the authority to decide in the first instance whether an invention is patentable is vested by the Congress in the Commissioner of Patents, and since in arriving at this decision he exercises a quasi-judicial function, whatever decision we might reach regarding the patentability of the Moskovitz ball joints would not be binding on the Commissioner. Were we to try to anticipate his decision we might be placed in the awkward position described in Hoeltge v. Hoeller, supra, 12 Fed.Cas. 290: "* * * If the injunction prayed for should be allowed, and the complainant should fail in his application for a patent, this court would be placed in the position of entertaining jurisdiction and granting relief in a case in which the complainant had not the shadow of either legal or equitable right."

When the license agreement is considered as we have construed it, the contract is not invalid for any of the reasons alleged by defendants Moskovitz and Micro Precision and the court's action in dismissing their counter-claim was correct.

We turn now to a consideration of defendant Frankel's cross-complaint against Moskovitz. This requires a further statement of the facts. On June 15, 1953, two days before the execution of the license agreement and sales contract with plaintiff, Frankel, Moskovitz and Neo-Tech (Old Republic) entered into an agreement setting forth what their respective rights and obligations would be after the license and sale to plaintiff. Moskovitz agreed therein that in addition to the interest in patents theretofore assigned to Frankel he would assign to the corporation, or in the alternative to Frankel at the latter's direction, a fifty percent interest in "* * * all future patents issued and patent applications applied for and any improvements thereon * * *" concerning certain enumerated automotive devices, including ball joint suspensions. It appears from the evidence that in 1958 certain litigation was then pending in the St. Louis County Circuit Court in which Frankel was the plaintiff and Moskovitz and one Leon Fine were the defendants. Fine is not identified, nor does the nature of the litigation appear in the record. All that appears is that in accordance with a stipulation, the court on or about July 2, 1958, entered a consent decree adjudging the contract of June 15, 1953 to be a valid agreement, supported by adequate consideration; ordering Moskovitz to assign to Frankel a fifty percent interest in a long

list of designated patents and pending patent applications, none of which include the presently involved Moskovitz ball joints; and directing Moskovitz to also assign to Frankel any patents issued on such specified applications, and any improvement thereon, "* * * together with any patent applications now filed or to be made in the future *by Moskovitz* * * *" (Emphasis supplied.) on (among other devices) ball joint suspensions. Admittedly Moskovitz has not been issued a patent on the Moskovitz ball joints, nor has he applied for one. Whether he should have applied for one or more patents on such devices cannot be determined until the patentability of the Moskovitz ball joints is determined. What we have said regarding our lack of jurisdiction to presently decide that issue is likewise applicable to Frankel's cross-claim against Moskovitz.

The motion of plaintiff Republic Engineering and Manufacturing Company to either affirm the judgment or to dismiss the appeal for failure to comply with the rules, is denied.

For the reasons stated it follows that that part of the judgment and decree dismissing the counter-claim of defendants Moskovitz and Micro Precision Engineering Company should be affirmed, that the remainder of the judgment and decree should be reversed, and the cause should be remanded for further proceedings not inconsistent with this opinion. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court.

Accordingly, the motion of plaintiff Republic Engineering and Manufacturing Company to either affirm the judgment or to dismiss the appeal for failure to comply with the rules, is denied; that part of the judgment and decree dismissing the counter-claim of defendants Moskovitz and Micro Precision Engineering Company is affirmed, the remainder of the judgment and decree is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

RUDDY, P. J., and WOLFE and ANDERSON, JJ., concur.